SCHAFER, Appellant and Cross–Appellee,

v.

SODERBERG & SCHAFER C.P.A.s, L.L.C., et al., Appellees and Cross–Appellants.

[Cite as *Schafer v. Soderberg & Schafer*, 196 Ohio App.3d 458, 2011-Ohio-4687.]

Court of Appeals of Ohio,
Sixth District, Ottawa County.

No. OT–10–009.

Decided Sept. 16, 2011.

462

Richard M. Kerger and Kimberly A. Conklin, for appellant.

Sarah A. McHugh and William T. Maloney, for appellees.

Osowik, Presiding Judge.

{¶ 1} This is an appeal by appellant/cross-appellee, Edmund M. Schafer, and a cross-appeal by appellees/cross-appellants, Soderberg & Schafer, C.P.A., L.L.C. ("S & S"), David Soderberg, and Joseph Brenner, from a judgment of the Ottawa County Court of Common Pleas, following a jury trial, in which the trial court granted a directed verdict and dismissed Schafer's individual claims against Soderberg and Brenner, and the jury found that Schafer was entitled to $540,000 in damages in a breach-of-contract action. On appeal, Schafer sets forth the following assignment of error:

{¶ 2} "The trial court erred when it granted appellees' motion for a directed verdict as to count I of the appellant's complaint."

{¶ 3} S & S, David Soderberg, and Joseph Brenner set forth the following cross-assignments of error on appeal:

{¶ 4} "[Cross-]Assignment of Error # 1: The lower court erred by failing to hold that the retirement buy-out provisions of the buy-sell agreement are too indefinite and uncertain to be enforced.

{¶ 5} "[Cross-]Assignment of Error # 2: The lower court erred in failing to hold that [appellant] failed to satisfy the conditions precedent to a sale of his interest in the company.

{¶ 6} "[Cross-]Assignment of Error # 3: The lower court erred in failing to find [appellant] repudiated the buy-sell agreement by imposing unreasonable conditions to the transfer of his interest in the company.

{¶ 7} "[Cross-]Assignment of Error # 4: The trial court erred by submitting an issue of law to the jury, allowing the jury to make its own interpretation of the language of a contract."

{¶ 8} In 1983, Edmund Schafer and David Soderberg, both certified public accountants, combined their accounting businesses into one partnership. Shortly thereafter, Schafer sold a building that he owned, which was located at 121 Jefferson Street in Port Clinton, Ohio, to the partnership. Schafer and Soderberg then formed a second company, 121 Jefferson Realty, L.L.C. Soderberg and Schafer each had a 50 percent interest in both the partnership and 121 Jefferson Realty.

{¶ 9} In 1999, Soderberg's nephew, Joseph Brenner, was hired as a clerk for the partnership. On January 1, 2002, Soderberg and Schafer executed documents whereby their partnership was converted to S & S, a limited-liability corporation. Immediately thereafter, additional documents were executed to make Brenner a shareholder with a 10 percent interest in S & S, while Soderberg and Schafer each retained a 45 percent interest in the business. The documents included an assignment of the general partnership's interest to S & S, a transfer of a 10 percent interest in S & S to Brenner, a promissory note in the amount of $60,000 taken in exchange for giving Brenner his 10 percent interest, an operating agreement that set forth how the company would be structured, and a no-competition agreement. The no-competition agreement stated that after leaving S & S, Schafer, Soderberg and Brenner agreed not to "directly or indirectly enter the employment of, or perform an advisory or consulting service for, or make a substantial investment in, any company, partnership, sole organization, proprietorship, or other entity that engages in the practice of accounting" in Erie, Huron, Ottawa, and Sandusky Counties for five years. Each member also agreed not to "make available to any other firm any data, research, customer list or process relating to the accounting business."

{¶ 10} In addition, the parties executed a buy-sell agreement that contained provisions that would be applied in the event that one of the three partners would die, leave the business, or elect to retire.

{¶ 11} From the inception of the original partnership, Schafer had acted as the manager for the partners' accounting business. As the managing partner, Schafer oversaw the functions of client billing, banking activities, paying of bills for the business, and supervision of employees. However, after S & S was formed and Brenner purchased an interest in the company, friction developed between Brenner and Schafer as to how S & S should be run.

{¶ 12} On February 20, 2008, Schafer asked Soderberg and Brenner for a meeting to discuss his retirement from S & S. At the meeting, which took place on March 3, 2008, Schafer gave written notice that he intended to retire from S & S not later than August 30, 2008, and that he wanted to cash out his interest in 121 Jefferson Realty. In the written notice, Schafer stated that pursuant to the

buy-sell agreement, his 45 percent of S & S was worth $540,000.[1] Schafer also gave Soderberg and Brenner copies of a to-do list in order to prepare the business and its owners for his upcoming retirement. Items on the to-do list included preparation of the following: (1) a retirement agreement, "including relevant tax structure of payments, allocation of 2008 income, [and] final capital distribution to Schafer," (2) a "note payable to Schafer, including personal loan guarantees," (3) "preparation and execution of [a] covenant not to compete," (4) a release of Schafer as guarantor of bank loans for S & S, (5) modifications to life insurance policies for Schafer, Soderberg, and Brenner that were held by S & S, and (6) provisions for transferring responsibility for running S & S and transitioning clients after Schafer's retirement. In addition, the to-do list addressed the necessity of obtaining a real estate appraisal before computing the amount necessary to compensate Schafer for his interest in 121 Jefferson Street.

{¶ 13} By agreement, further discussion of the matter was postponed until after tax season. In the interim, Schafer hired an attorney, who drafted a proposed "Purchase Agreement of Retired Members [sic] Interest by Company and Members." Attached to the purchase agreement was a "Determination of Value of Member's Interest and Subsequent Year Guarantee as of the 1st Day of Jan., 2008," executed by Schafer, Soderberg, and Brenner, which placed the value of Schafer's 45 percent interest in S & S at $540,000. Also attached was a new proposed no-competition agreement, which stated that Schafer agreed not to "actively solicit any of the business accounts or customers of [S & S] existing as of the date" that the new agreement was executed.

{¶ 14} A meeting was held at the end of the tax season, at which Schafer and Soderberg disagreed as to what method should be used to determine the value of 121 Jefferson Street. No consensus was reached as to the terms of Schafer's retirement. In May 2008, another meeting took place, at which Schafer offered not to withdraw from 121 Jefferson Street, in order to resolve the conflict as to its valuation. Thereafter, Schafer, Soderberg, and Brenner discussed Schafer's impending retirement. At some point during the meeting, Brenner presented Schafer with a draft of a no-competition agreement that Schafer refused to accept, even though Schafer stated that he had no intention of competing for business with S & S. In addition, Soderberg and Brenner refused to personally guarantee the company's obligation to pay Schafer $540,000. The meeting ended without producing any agreement as to the terms of Schafer's retirement. No further direct communication took place between the three men after that date.

---

1. Schedule A, appended to the buyout agreement, also stated that Soderberg's 45 percent interest in S & S was valued at $540,000 and that Brenner's 10 percent interest was valued at $120,000.

{¶ 15} On August 21, 2008, Schafer received an e-mail from Dean Miller, president of First National Bank ("FNB") in Bellevue, Ohio, informing Schafer that the firm's line of credit would expire at the end of the month and asking for personal financial information from Soderberg and Brenner to support its renewal. Schafer forwarded the e-mail to Soderberg and Brenner, who did not provide the information. Consequently, at the end of August the line of credit, which was used to pay S & S's employees and expenses in the event of uneven cash flow, was canceled.

{¶ 16} On August 22, 2008, Schafer filed a complaint against Soderberg, Brenner, and S & S in the Ottawa County Court of Common Pleas, in which he sought damages for breach of fiduciary duties owed by Soderberg to Schafer and S & S and sought declaratory judgment in his favor on the issues of the parties' rights and responsibilities under the buy-sell agreement, including the purchase price for Schafer's interest in the company and a payment schedule.

{¶ 17} Schafer continued to work for S & S after the complaint was filed. On October 2, 2008, Schafer circulated a memo to all S & S employees, informing them that he would retire effective November 3, 2008. In mid-October, Soderberg gave Schafer written notice that he, too, intended to retire and that the company should pay him $540,000 for his share of the business. On October 3, 2008, Schafer filed his first amended complaint, in which he added an additional claim for breach of contract and asked the trial court to declare that Soderberg and S & S were in breach of both the buy-sell agreement and the 2002 no-competition agreement.

{¶ 18} Without the line of credit at FNB, S & S began experiencing cash-flow problems in October 2008. When Schafer refused to give Soderberg and Brenner their paychecks, they entered his office, removed several checks from his desk, and wrote the paychecks themselves. During that same time period, Brenner repeatedly asked Schafer for access to the firm's accounting database, which Schafer refused.

{¶ 19} On November 5, 2008, a meeting was held at which Schafer stated that he was retired from S & S; however, Schafer stated that he had no intention of competing with the company in the future. A vote was taken at the meeting, in which Soderberg and Brenner voted to dissolve S & S. Schafer did not vote at the meeting. That same day, Schafer and his wife, who performed clerical duties for the accounting firm, stopped working for S & S.

{¶ 20} On December 9, 2008, after hiring new counsel, Schafer filed his second amended complaint, in which he restated his claims against Soderberg, Brenner, and S & S. In Count One, Schafer alleged that Soderberg and Brenner had breached their duties under the 2002 buy-sell agreement, which required them to purchase Schafer's interest in S & S for $540,000 upon his retirement. In Count

Two, Schafer alleged that the no-competition agreement executed by the parties in 2002 was invalid. In Count Three, Schafer alleged that because Soderberg, Brenner, and S & S refused to make regular monthly payments to Schafer, as required by the buy-sell agreement, Schafer had incurred damages in the amount of $27,000 plus interest and that the damage would continue so long as those payments were not made.

{¶ 21} Consequently, Schafer asked the trial court for the following:

{¶ 22} "1. A declaration that the non-competition agreement executed by [Schafer] is not effective or enforceable.

{¶ 23} "2. Judgment against Messrs. Soderberg and Brenner in the amount of $540,000 each, individually and separately.

{¶ 24} "3. A judgment against Soderberg and Schafer C.P.A., L.L.C. in the amount of $540,000.

{¶ 25} "4. Such other relief as the Court should determine the plaintiff is entitled to further but not limited to punitive damages and an award of attorney fees."

{¶ 26} On December 31, 2008, the company ceased operating as S & S and began offering accounting services as Soderberg and Brenner, C.P.A., L.L.C. ("S & B"). S & B was located in the same building and operated with essentially the same employees and equipment as S & S. Schafer began new employment as the chief financial officer of FNB.

{¶ 27} On February 13, 2009, Soderberg, Brenner, and S & S filed a joint answer to the second amended complaint along with a counterclaim, in which they asked the trial court to declare (1) that Soderberg and Brenner were entitled to wind up the affairs of S & S, (2) whether or not, and to what extent, the no-competition agreements executed by Schafer, Brenner, and Soderberg on July 9, 2002, were "invalid, void and unenforceable," (3) that the buy-sell agreement "imposes no enforceable rights or obligations on the parties," and (4) that Schafer had "repudiated and breached the Buy–Sell Agreement * * * and failed to meet the conditions required for retirement under [its] terms." On February 19, 2009, Schafer filed an answer, in which he asked the trial court to dismiss the counterclaim pursuant to Civ.R. 12(B)(6) and also on grounds of estoppel and breach of contract.

{¶ 28} On July 31, 2009, Soderberg, Brenner, and S & S filed a joint motion for partial summary judgment, in which they asked the trial court to dismiss Schafer's breach-of-contract claim, as stated in Count Three of the second amended complaint. In support, Soderberg, Brenner, and S & S argued that the buy-sell agreement was unenforceable because it did not adequately address the possibility that more than one partner would retire at the same time. They also

argued that, at best, the original buy-sell agreement was an "agreement to agree" on the terms of a no-competition agreement in the event of a partners' retirement.

{¶ 29} Soderberg, Brenner, and S & S further argued that Schafer did not meet the preconditions for retirement under the buy-sell agreement, because he was not yet 55 years old when he submitted the notice of his intent to retire. Finally, Soderberg, Brenner, and S & S argued that Schafer's submission of the to-do list, purchase agreement, cognovit promissory note, and new agreement not to compete supports their claim that he repudiated the buy-sell agreement.

{¶ 30} Attached to the motion was a memorandum in support, along with copies of the buy-sell agreement, Brenner's promissory note for $60,000 to S & S, the valuation of each partners' interest in S & S as of January 1, 2008, Schafer's proposed to-do list, purchase agreement, agreement not to compete, and a cognovit promissory note for $540,000, Schafer's notice of intent to retire, the notice of the partners' meeting held on March 3, 2008, and Schafer's deposition taken on May 26, 2009.

{¶ 31} On October 21, 2009, Schafer filed a response in opposition to the motion for partial summary judgment, in which he asserted that his to-do list did not amount to a repudiation of the buy-sell agreement. In addition to the documents relied upon in the motion for partial summary judgment, Schafer attached to his response copies of the 2002 no-competition agreement and correspondence between his attorney and the attorney representing Soderberg, Brenner, and S & S.

{¶ 32} On November 23, 2009, the trial court filed a judgment entry in which it found that the record contained insufficient evidence to demonstrate that the 2002 no-competition agreement was no longer in effect. The trial court also found that the buy-sell agreement could be interpreted to mean that a partner need not be 55 at the time notice of his intent to retire is given, so long as he attains age 55 before retirement begins. Finally, the trial court found that Schafer's unsuccessful attempt to renegotiate the buy-sell agreement did not amount to a repudiation of the terms of that agreement. Accordingly, the trial court found, as a matter of law, that the motion for partial summary judgment was not well taken and denied it on that basis.

{¶ 33} A jury trial was held on January 11, 12, 13, and 14, 2010. Testimony at the trial was presented by Schafer, Soderberg, Brenner, Huntington Bank employee Terry Chapman, and S & S employees Jessica Lake, Sue Unverferth, and Cheryl Courtney.

{¶ 34} At trial, Schafer testified that he had mixed feelings about the quality of Brenner's work, which "plateaued" after Brenner became a partner in S & S. Schafer also testified that after he and Brenner disagreed on some issues,

Schafer decided that it was time to leave S & S. Schafer stated that at the meeting on March 8, 2008, there were no comments made about his retirement notice; however, Soderberg later disagreed with Schafer's valuation of the real estate. He further stated that at the meeting in May 2008, Soderberg and Brenner wanted him to sign a no-competition agreement that would keep him from working anywhere in Ohio.

{¶ 35} On cross-examination, Schafer testified that he filed the original complaint mainly because of his partners' stance on the no-competition agreement and also because Schafer was afraid that he would not be paid for his share of S & S when he retired. Schafer stated that he was offered a job as chief financial officer of a local bank. Schafer also testified that the 2002 buy-sell agreement was the only buy-sell agreement in effect and that pursuant to section A of the buy-sell agreement, the company was required to purchase the interest of a retiring partner.

{¶ 36} Schafer further stated on cross-examination that while he thought a separate retirement agreement was a good idea, it was not essential under the buy-sell agreement. Schafer further stated that he wanted Soderberg and Brenner to execute personal loan guarantees and sign a cognovit note guaranteeing payment because he was concerned that the two would conspire not to pay him for his share of the company after he retired. He also stated that in his opinion, the 2002 no-competition agreement "had no application to the buy-sell retirement provision." Schafer acknowledged that, in a letter written on June 25, 2008, his attorney stated, "A retiring member shall be required to execute a no-competition upon retirement." However, he did not intend to compete with S & S for business in the future.

{¶ 37} Schafer testified that due to the bickering between the parties, an anticipated transition of clients never occurred. He also testified that he did not renew S & S's accounting license or its line of credit, because Soderberg and Brenner did not supply information that was necessary for those renewals. Schafer stated that he restricted Soderberg's and Brenner's access to the company's books and bank accounts because he feared they would manipulate the data.

{¶ 38} On redirect, Schafer testified that he gave Soderberg an ultimatum in February 2008 that either he or Brenner had to leave S & S, to which Soderberg did not respond. Schafer further testified that before a dispute arose about buying his interest in S & S, all the partners agreed that his 45 percent of the company was worth $540,000.

{¶ 39} On recross, Schafer testified that he should be paid $308,750 for his interest in 121 Jefferson Realty. He also stated that in his opinion, S & S was no longer entitled to the benefits of his life insurance policy.

{¶ 40} Soderberg testified at trial that his nephew, Brenner, did not get along with Schafer; nevertheless, he was flabbergasted when Schafer presented the ultimatum that either Schafer or Brenner should leave S & S. Soderberg also testified that all three men agreed that Schafer's 45 percent of S & S was worth $540,000; however, he now believes that Schafer should not be paid "after all [he and Brenner] have gone through." Soderberg stated that he would have paid Schafer the money if he had signed a new no-competition agreement that covered Huron, Ottawa, Sandusky, and Erie counties. Soderberg stated that S & S lost 75 to 80 clients when Schafer left the firm. He also stated that Schafer's $400,000 valuation for 121 Jefferson Street was too high, since the appraised value of the property was actually $258,000.

{¶ 41} On cross-examination, Soderberg stated that his attorney came up with the ploy of Soderberg's retirement announcement and that he, Soderberg, had no intention of actually retiring. Soderberg also stated that in his opinion, Schafer would have been entitled to $540,000 if he had agreed to honor the 2002 no-competition agreement.

{¶ 42} Brenner testified at trial that he joined S & S in 1999 as an accounting clerk and became a partner in 2002, when he purchased a 10 percent interest in the business. Brenner further testified that he and Soderberg were willing to discuss the proposals in Schafer's to-do list; however, the length of Schafer's proposed no-competition agreement was too short, and his valuation of 121 Jefferson Street was too high.

{¶ 43} Brenner testified that Schafer and Soderberg executed an operating agreement for S & S in January 2002 and that, pursuant to section 3.2 of the agreement, no partner was to have personal liability for the debts of the partnership. The 2002 no-competition agreement was executed at the same time as the operating agreement and was signed by Schafer, Soderberg, and accounting associate Cheryl Courtney. Brenner further testified that Schafer originally sought to invalidate the 2002 no-competition agreement. However, when Schafer presented Brenner and Soderberg with his proposal for a new no-competition agreement, they responded by giving Schafer a boilerplate no-competition agreement as a starting point for negotiations.

{¶ 44} Brenner stated that he did not remember Schafer promising not to compete with S & S after he retired. Brenner also disagreed with Schafer's method of valuing the real estate by including its rental value, since the partners paid the rent to themselves. Brenner stated that he left the meeting because Schafer stated that he should be paid more than $540,000.

{¶ 45} Brenner testified that Schafer denied him access to the practice-management program on request and that Schafer allowed the company's line of credit to expire. Brenner also testified that they didn't have to expel Schafer

from S & S, because they found out that Schafer had taken another job. He stated that S & B kept most of S & S's clients after Schafer's departure; however, the company lost $140,000 to $150,000 in revenue after the split and can no long afford to pay Schafer $540,000.

{¶ 46} On cross-examination, Brenner testified that Schafer's interest in S & S was worth $540,000. Brenner stated that he received Schafer's e-mail regarding the expiration of S & S's line of credit, but he did not respond to it. Brenner further stated that he and Soderberg took $10,000 from S & S when they formed S & B.

{¶ 47} Brenner testified that Schafer disrespected him because he disagreed with Schafer as to how to format client correspondence. He further testified that at the time of trial, Schafer's 45 percent of S & S was worth about $60,000. Brenner admitted that he and Soderberg did not have to dissolve S & S and that their actions prevented Schafer from receiving payment for his interest in the company. He also stated that Schafer became angry when Brenner and Soderberg proposed a cut in the rent for 121 Jefferson Street.

{¶ 48} On redirect, Brenner testified that Schafer stated that the 2002 no-competition agreement was void when he came to the meeting on November 5, 2008. Schafer also stated at that meeting that he would not assist in transitioning the clients to Soderberg and Brenner. On recross, Brenner stated that he and Soderberg did not ask Schafer to help transition the clients and that Schafer told them at the meeting that he did not want to continue in the profession of public accounting.

{¶ 49} Terry Chapman testified at trial that he assisted S & S with its line of credit until 2008, at which time the line expired. He then worked with Soderberg and Brenner to establish a new line of credit for S & B. Chapman further testified that he listed the change of ownership as a weakness on S & B's loan application; however, Soderberg and Brenner assured him that they did not anticipate a loss of business as a result of Schafer's retirement.

{¶ 50} Jessica Lake testified at trial that she worked first for S & S, and then for S & B, as a billing clerk. Lake also testified that Schafer's wife, Lesta, provided some training in November 2008. On cross-examination, Lake said that Schafer told the employees that Soderberg and Brenner were thwarting his retirement efforts. She also stated that a substantial number of clients were upset when Schafer left. On redirect, Lake testified that there was tension in the office after Schafer announced his retirement and that the partners did not speak to each other directly after the announcement was made.

{¶ 51} Sue Unverferth testified that she was a staff accountant at S & S and that she made the transition to S & B after S & S was dissolved. Unverferth

testified that Schafer managed the business and set policy, although he did not always follow his own rules and was often condescending to employees. On cross-examination, Unverferth stated that she often thought of quitting due to the stress of the transition. She also stated that all of the staff made the transition to S & B after Schafer's departure.

{¶ 52} Cheryl Courtney, CPA, testified at trial that the clients were each loyal to his or her individual accountants and that Schafer's clients were upset when he left S & S. On cross-examination, Courtney testified that at least two clients left when Schafer retired. Courtney further testified that she had no knowledge of an attempt to expel Schafer from the business and did not know why he left; however, she was aware that he was no longer working as an accountant.

{¶ 53} At the close of all the testimony, the trial court found that pursuant to the buy-sell agreement, a partner must reach the age of 55 before actual retirement, not before the six-month retirement notice is given. The trial court also found that the buy-sell agreement was a valid contract. The court then granted Soderberg's and Brenner's motion for a directed verdict as to count one of the amended complaint, which set forth Schafer's breach-of-contract claim. In so doing, the trial court found that R.C. 1705.29, which sets forth the standard of care for managers of a limited-liability company, does not apply to Soderberg and Brenner, since Schafer managed S & S at all times relevant to the allegations set forth in the complaint. Accordingly, the trial court found that Soderberg and Schafer had no personal liability for breach of contract as a matter of law. The case was then given to the jury to deliberate as to what, if any, liability remained on the part of S & S.

{¶ 54} While the jury deliberated, a trial to the court was held as to the judicial dissolution of 121 Jefferson. After receiving evidence presented by both parties, the trial court found that Schafer was entitled to dissolution of the real estate limited-liability company. The trial court ordered the public sale of the property.

{¶ 55} After deliberations, the jury returned a verdict in Schafer's favor and ordered S & S to pay Schafer $540,000. The jury also made the following relevant findings: (1) the buy-sell agreement did not require a retiring partner to execute a new no-competition agreement, (2) Schafer did not breach the buy-sell agreement, (3) Schafer did not breach his duty of good faith and fair dealing under the buy-sell agreement or make its performance impracticable by his actions, (4) Schafer met all the conditions for retirement under the buy-sell agreement, and (5) Schafer was harmed by S & S's breach of the buy-sell agreement.

{¶ 56} Based on the jury's findings, the trial court ordered the winding up of S & S. The trial court also denied Soderberg's and Brenner's counterclaims for declaratory judgment on the issues of whether the buy-sell agreement was

enforceable and whether Schafer breached the buy-sell agreement and found that the five-year term of the 2002 no-competition agreement was still in force.

{¶ 57} Soderberg, Brenner, and S & S filed a motion for judgment notwithstanding the verdict ("JNOV") on February 1, 2010. The trial court's judgment entry setting forth the jury's findings and the trial court's decision as to the cross-complaint for declaratory judgment was filed on February 5, 2010. On February 24, 2010, Schafer filed a notice of appeal from the trial court's judgment. The trial court denied the JNOV on February 26, 2010. A notice of cross-appeal was filed in this court on March 2, 2010.

{¶ 58} In his sole assignment of error, Schafer asserts that the trial court erred by finding that Soderberg and Brenner were not personally liable to Schafer and thereafter directing a verdict against him. In support, Schafer argues that the evidence presented to the jury, including Soderberg's "fake" retirement notice and the dissolution of S & S followed by the formation of S & B, demonstrates an orchestrated effort by Soderberg and Brenner to defraud Schafer of his retirement payout. Schafer relies on R.C. 1705.29 to support his argument that as managers of the company, Soderberg and Brenner breached a duty of good faith and fair dealing when they voted to dissolve S & S instead of continuing the company so that Schafer could be paid for his share of the business. Accordingly, Schafer concludes that the trial court should have allowed the issue of "whether Brenner and Soderberg had intentionally breached, or wrongfully refused to honor, the Buy–Sell Agreement" to be considered by the jury.

{¶ 59} The standard of review for a motion for directed verdict is analogous to that of a motion for summary judgment. *Ohio Cas. Ins. Co. v. D & J Distrib. & Mfg., Inc.*, 6th Dist. No. L–08–1104, 2009-Ohio-3806, 2009 WL 2356849, ¶ 29. Summary judgment will be granted when there remains no genuine issue of material fact and, when construing the evidence most strongly in favor of the nonmoving party, reasonable minds can only conclude that the moving party is entitled to judgment as a matter of law. Civ.R. 56(C). Similarly, in determining a motion for directed verdict, after construing the evidence most strongly in favor of the party against whom the motion is directed, the trial court must find that upon any determinative issue reasonable minds could come to but one conclusion upon the evidence submitted and that conclusion is adverse to that party. Civ.R. 50(A)(4).

{¶ 60} "In construing the evidence most strongly in favor of the party against whom the motion is directed, the trial court 'must neither consider the weight of the evidence nor the credibility of the witnesses.'" *Ohio Cas. Ins. Co.* at ¶ 29, quoting *Strother v. Hutchinson* (1981), 67 Ohio St.2d 282, 284, 423 N.E.2d 467. In cases "where reasonable minds might reach different conclusions regard-

ing the evidence presented and where there is substantial, competent evidence to support the claim of the party against whom the motion is made, the motion for directed verdict must be denied." Id., citing *Kroh v. Continental Gen. Tire, Inc.* (2001), 92 Ohio St.3d 30, 31, 748 N.E.2d 36.

{¶ 61} R.C. 1705.29 states:

{¶ 62} "(A) If the operating agreement of a limited liability company provides for managers, then the business of the company shall be exercised by or under the direction of its managers, except to the extent applicable law or the operating agreement provides otherwise." The statute goes on to state that a manager must perform his duties in good faith, "in a manner he reasonably believes to be in or not opposed to the best interests of the company, and with the care that an ordinarily prudent person in a similar position would use under similar circumstances." R.C. 1705.29(B). Pursuant R.C. 1705.29(D), a manager is liable in damages "only if it is proved, by clear and convincing evidence, in a court with jurisdiction, that his action or failure to act involved an act or omission undertaken with deliberate intent to cause injury to the company or undertaken with reckless disregard for the best interests of the company."

{¶ 63} Section 2.6 of the operating agreement designated Schafer as the statutory agent for S & S. However, although Schafer acted as the practice manager of S & S, section 5.1 of the operating agreement states, "The Company [S & S] shall be managed by the Members. * * * [who] shall have the right to act for and bind the Company in the ordinary course of its business." The "members" are defined as "each Person signing this Agreement and any Person who subsequently is admitted as a member of the Company."

{¶ 64} As set forth above, the operating agreement does not provide for the specific designation of a "manager," as envisioned by R.C. 1705.29. Even if such a provision existed, it was Schafer, not Soderberg or Brenner, who actually managed the affairs of S & S through October 2008. Accordingly, R.C. 1705.29 does not apply in this instance.

{¶ 65} As to whether Soderberg and Brenner have any personal liability for actions they took as members of S & S, section 3.2 of the operating agreement states: "No member shall have any personal liability for any obligations of the Company." Section 5.5.1 further states:

{¶ 66} "A Member shall not be liable, responsible, or accountable, in damages or otherwise, to any other Member or to the company for any act performed by the Member with respect to Company matters, except for fraud, gross negligence, or an intentional breach of this Agreement."

{¶ 67} Schafer alleges that Soderberg and Brenner breached a duty to S & S when (1) Soderberg issued a "fake" retirement notice and (2) Soderberg and Brenner voted to dissolve the company in an effort to avoid making Schafer's retirement payout. This argument must fail, for the following reasons.

{¶ 68} As in a partnership, a limited-liability company generally imposes on its members "a duty to exercise the utmost good faith and honesty in all dealings and transactions related to the company." *Blair v. McDonagh*, 177 Ohio App.3d 262, 2008-Ohio-3698, 894 N.E.2d 377, ¶ 42. However, Ohio courts have held that a shareholder in a limited-liability company "does not act in bad faith simply by voting [his or] her shares." *Herbert v. Porter*, 165 Ohio App.3d 217, 2006-Ohio-355, 845 N.E.2d 574, ¶ 17.

{¶ 69} Pursuant to section 7.1.2 of the buy/sell agreement, S & S could be dissolved "upon the unanimous written agreement of the members." Since by his own admission, Schafer was retired from S & S by the time the meeting was held on November 5, 2008, Soderberg and Brenner were the only remaining members of S & S and had the right to dissolve S & S. Also, in spite of making statements to the contrary, Schafer has not demonstrated that Soderberg's allegedly "fake" retirement notice had any effect on his own decision to retire. Accordingly, Soderberg's and Brenner's vote to dissolve the company did not constitute a breach of the operating agreement, the buy-sell agreement, or any duty owed to S & S or Schafer.

{¶ 70} On consideration of the foregoing, we find that the trial court did not err by not granting a directed verdict against Soderberg and Brenner and dismissing Count One of the amended complaint. Appellant's sole assignment of error is not well taken.

{¶ 71} In their first cross-assignment of error, Soderberg, Brenner, and S & S assert that the trial court erred by relying on the jury's conclusion that the retirement provision of the buy-sell agreement was enforceable and dismissing their counterclaim for declaratory judgment on that issue. In support, cross-appellants argue that the buy-sell agreement unambiguously required Schafer to execute a new no-competition agreement. In addition, cross-appellants argue that the omission of specific terms, including a new, fleshed-out no-competition agreement, turns the entire buy-sell agreement unto an indefinite, unenforceable "agreement to agree."

{¶ 72} On appeal, the trial court's decision in a declaratory-judgment action will not be overturned absent a finding of abuse of discretion. *Maxwell v. Fry*, 12th Dist. No. CA2007–11–284, 2009-Ohio-1650, 2009 WL 903828, ¶ 16, citing *Mid–American Fire & Cas. Co. v. Heasley*, 113 Ohio St.3d 133, 2007-Ohio-1248, at ¶ 14. "Abuse of discretion" connotes more than a mere error of law or

judgment, instead requiring a finding that the trial court's decision was unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore* (1983), 5 Ohio St.3d 217, 219, 450 N.E.2d 1140.

{¶ 73} We note initially that, contrary to cross-appellants' argument, a dispute as to the meaning of a particular contract term does not necessarily render the contract so indefinite as to be an unenforceable agreement to agree. *Ruffian, L.L.C. v. Hayes,* 10th Dist. No. 09AP–948, 2011-Ohio-831, 2011 WL 683770, ¶ 18, citing *Allen v. Bennett,* 9th Dist. No. 23570, 2007-Ohio-5411, 2007 WL 2935879, ¶ 14. "This is true because '[a]ll agreements have some degree of indefiniteness and some degree of uncertainty. In spite of its defects, language renders a practical service. In spite of ignorance as to the language they speak and write, with resulting error and misunderstanding, people must be held to the promises they make.' " Id. at ¶ 18, quoting *Kostelnik v. Helper,* 96 Ohio St.3d 1, 4, 2002-Ohio-2985, 770 N.E.2d 58, ¶ 17, quoting 1 Corbin on Contracts (Perillo Rev. Ed.1993) 530, Section 4.1.

{¶ 74} It is well settled that courts cannot make a contract for the parties. *Litsinger Sign Co. v. Am. Sign Co.* (1967), 11 Ohio St.2d 1, 14, 227 N.E.2d 609, citing 1 Corbin on Contracts, 394 and 398, Section 95; Williston on Contracts (3 Ed.), Section 37; 11 Ohio Jurisprudence 2d 283, Contracts, Section 42; *Barstow v. O.U. Real Estate, III, Inc.,* 4th Dist. No. 01CA49, 2002-Ohio-4989, 2002 WL 31108801, ¶ 40. Accordingly, "if the parties' manifestations taken together as making up the contract, when reasonably interpreted in the light of all the circumstances, do not enable the court to determine what the agreement is and to enforce it without, in effect, 'making a contract for the parties,' no enforceable obligation results." Id. However, "[i]f it is found that the parties intended to be bound, the court should not frustrate this intention, if it is reasonably possible to fill in some gaps that the parties have left, and reach a fair and just result." Id. Ultimately, the determination as to whether the parties intended to be bound by a contract is a question of fact. *Oglebay Norton Co. v. Armco, Inc.* (1990), 52 Ohio St.3d 232, 235, 556 N.E.2d 515.

{¶ 75} As to whether the jury should have been given the opportunity to interpret the buy-sell agreement, Ohio courts have held that ambiguity exists in a contract where the meaning of a particular term " 'cannot be determined from * * * the agreement or where the language is susceptible of two or more reasonable interpretations.' " *Walsh v. Marsh Bldg. Products, Inc.,* 12th Dist. No. CA2009–10–130, 2010-Ohio-729, 2010 WL 703256, ¶ 11, quoting *United States Fid. & Guar. Co. v. St. Elizabeth Med. Ctr.* (1998), 129 Ohio App.3d 45, 55, 716 N.E.2d 1201. In cases where "a contract is clear and unambiguous, then its interpretation is a matter of law and there is no issue of fact to be determined."

*Alexander v. Buckeye Pipe Line Co.* (1978), 53 Ohio St.2d 241, 374 N.E.2d 146. However, in cases where ambiguity exists, "interpretation of the parties' intent is a question to be determined by the trier of fact." *Walsh v. Marsh Bldg. Products, Inc.,* at ¶ 11, citing *Amstutz v. Prudential Ins. Co.* (1940), 136 Ohio St. 404, 408, 26 N.E.2d 454.

{¶ 76} Soderberg testified at trial that in his opinion, Schafer's proposed no-competition agreement was too limited in scope and duration. Soderberg further testified that he and Brenner presented Schafer with a boilerplate version of a no-competition agreement that, like the 2002 no-competition agreement, had a duration of five years and prohibited Schafer from practicing as a CPA in Ottawa, Huron, Sandusky, or Erie Counties. Schafer testified at trial that he opposed Soderberg's and Brenner's proposed no-competition agreement because it was too long and covered more area than just Sandusky County. Schafer further testified that he proposed a no-competition agreement that was shorter and more limited in scope than the 2002 no-competition agreement because he did not intend to practice accounting after his retirement.

{¶ 77} While the parties differ as to their preferred terms for a no-competition agreement, they do not dispute that a no-competition agreement was contemplated by the buy-sell agreement. Accordingly, the issue was correctly presented to the jury, which then determined that the parties intended to be bound by a no-competition agreement in the event that one of them would retire. The only remaining issue was the scope and duration of such an agreement, which the jury resolved by finding that Schafer was not required to execute a new no-competition agreement, in effect enforcing the terms of the 2002 agreement.

{¶ 78} On consideration of the foregoing, we find that the trial court did not abuse its discretion by denying cross-appellants' motion for declaratory judgment on the issue of whether the buy-sell agreement was enforceable. Cross-appellants' first cross-assignment of error is not well taken.

{¶ 79} In their second cross-assignment of error, cross-appellants assert that the trial court erred by not declaring that Schafer failed to satisfy conditions precedent to selling his interest in S & S. In support, cross-appellants argue that (1) section (C)(1)(b) unambiguously requires a retiring member to execute a covenant not to compete before he can be treated as retired and (2) Schafer violated the buy-sell agreement by issuing his notice of intent to retire three months before he actually attained the age of 55. We will examine each of these arguments separately.

{¶ 80} Section (C)(1)(b) of the buy-sell agreement defines "retirement" as follows:

{¶ 81} "[T]he voluntary retirement of a Member one hundred eighty (180) days following receipt by company of written notice of intent to Retire, but only after the Member has reached the age of at least fifty-five (55). To be treated as Retired hereunder such Member shall be required to execute a covenant not to compete upon Retirement."

{¶ 82} As to the first argument, as used in the buy-sell agreement, the phrase "upon retirement" reasonably could either (1) refer to the point in time at which a new no-competition agreement must be executed or (2) signal the beginning of the period in which a retiring member would cease competing with S & S. Accordingly, the term "upon retirement" is ambiguous, and trial court correctly asked the jury to determine its meaning. See *Walsh v. Marsh Bldg. Products, Inc.*, 2010-Ohio-729, 2010 WL 703256, at ¶ 11. Essentially, the jury was asked to determine whether Schafer was required either to execute a new no-competition agreement before he could be eligible to retire or to refrain from competing with S & S after he retired. After considering the evidence as set forth above, the jury answered the first question in the negative and found that the 2002 no-competition agreement was enforceable against Schafer after he retired. When interpreting a contract, courts are required to give effect to the intent of the parties. In so doing, we must "examine the contract as a whole and presume that the intent of the parties is reflected in the language of the contract. In addition, we will look to the plain and ordinary meaning of the language used in the contract unless another meaning is clearly apparent from the contents of the agreement. When the language of a written contract is clear, a court may look no further than the writing itself to find the intent of the parties." *Sunoco, Inc. (R & M) v. Toledo Edison Co.*, 129 Ohio St.3d 397, 2011-Ohio-2720, 953 N.E.2d 285, ¶ 37.

{¶ 83} As to the second argument, whenever possible, courts interpreting a contract must give effect to every provision of the contract. Id. at ¶ 54. If a particular construction of a contract condition "would render a clause meaningless and it is possible that another construction would give that same clause meaning and purpose, then the latter construction must prevail." Id., citing *Foster Wheeler Enviresponse, Inc. v. Franklin Cty. Convention Facilities Auth.* (1997), 78 Ohio St.3d 353, 362, 678 N.E.2d 519; *Farmers Natl. Bank v. Delaware Ins. Co.* (1911), 83 Ohio St. 309, 94 N.E. 834, paragraph six of the syllabus.

{¶ 84} In this case, the trial court found, based on the evidence presented by the parties, that "the only reasonable reading of that [provision] is that one has to be 55 years old at the time of retirement," and not at the time the notice is given. As set forth above, section (C)(1)(b) does not set forth any minimum age

for retirement except age 55. If the notice provision were interpreted as suggested by cross-appellants, the minimum age for retirement would be 55 ½. Accordingly, the trial court correctly interpreted the plain language of section (C)(1)(b) to mean that a partner must attain the minimum age of 55 before he or she could be treated as retired, and not before notice of a partner's intent to retire can be given.

{¶ 85} On consideration of the foregoing, we find that the trial court did not err by refusing to declare that Schafer failed to satisfy a condition precedent to his retirement from S & S. Cross-appellees' second cross-assignment of error is not well taken.

{¶ 86} In their third cross-assignment of error, cross-appellees assert that the trial court erred when it found that Schafer did not repudiate his rights under the buy-sell agreement. In support, cross-appellees argue that Schafer's attempt to negotiate the terms of his retirement buyout "effectively rejected the Buy–Sell Agreement as the basis for determining terms on which Schafer would sell his interest in the company back to S & S."

{¶ 87} An anticipatory repudiation of a contract occurs when one party to the contract refuses to perform under the contract's terms before the time for performance has arrived. *Southeast Land Development, Ltd. v. Primrose Management, L.L.C.*, 193 Ohio App.3d 465, 2011-Ohio-2341, 952 N.E.2d 563, ¶ 7, citing *Blake Homes, Ltd. v. FirstEnergy Corp.*, 173 Ohio App.3d 230, 2007-Ohio-4606, 877 N.E.2d 1041, ¶ 73.

{¶ 88} " 'An anticipatory breach of contract must be an unequivocal repudiation of the contract. [*Sentinel Consumer Prod., Inc. v. Mills, Hall, Walborn & Assoc., Inc.* (1996), 110 Ohio App.3d 211, 673 N.E.2d 967.] A mere request for a change in terms or for cancellation does not constitute a repudiation. Similarly, a mere expression of doubt as to willingness or ability to perform is insufficient to constitute repudiations of a contract.' " (Citations omitted.) *Southeast Land Dev., Ltd. v. Primrose Mgmt., LLC*, quoting 18 Ohio Jurisprudence 3d (2011), Contracts, Section 237. Ultimately, "[w]hether a party has repudiated a contract or merely expressed doubt as to willingness to perform is a question of fact." *Peebles Elderly Hous. Ltd. Partnership v. Titan Indemn. Co.* (Sept. 15, 1997), Adams App. No. 96 CA 631, 1997 WL 578735.

{¶ 89} As set forth above, Schafer submitted a proposed to-do list to cross-appellees to clarify the terms of his retirement buyout. Although he initially argued that the 2002 no-competition agreement was no longer in effect, Schafer attempted to negotiate new terms, rather than refusing to enter into any no-competition agreement. The record also shows that cross-appellees did not attempt to prevent Schafer from retiring, nor do they assert that Schafer was

prevented from retiring because the parties could not agree on the terms of a buyout. Instead, they treated Schafer as retired and voted to dissolve S & S and now argue that they are excused from paying Schafer for his share of the company because his efforts to negotiate new terms for a no-competition agreement and to secure the obligation to pay for his share of the company constitute an anticipatory repudiation of the buy-sell agreement.

{¶ 90} On consideration of the foregoing, we find that the jury did not err by finding that Schafer's conduct does not amount to an anticipatory repudiation of the buy-sell agreement. Cross-appellees' third cross-assignment of error is not well taken.

{¶ 91} In their fourth cross-assignment of error, cross-appellants assert that the trial court erred by allowing the jury to even consider the issue of whether Schafer was required to execute a new covenant not to compete before he could retire. Based on our determination of cross-appellants' first cross-assignment of error, we find that this cross-assignment of error is not well taken.

{¶ 92} The judgment of the Ottawa County Court of Common Pleas is affirmed. Cross-appellees, Soderberg, Brenner, and S & S are ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment affirmed.

HANDWORK and SINGER, JJ., concur.