[Cite as *Bayer v. Nachtrab*, 2014-Ohio-5586.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

Joan Bayer                                Court of Appeals No. L-13-1209

    Appellee                             Trial Court No. CI0201204990

v.

Joseph Nachtrab, et al.                   **DECISION AND JUDGMENT**

    Appellants                           Decided:  December 19, 2014

* * * * *

Richard M. Kerger and Kimberly A. Conklin, for appellee.

John J. McHugh, III and Matthew M. McHugh, for appellants.

* * * * *

**OSOWIK, J.**

{¶ 1} This is an appeal from a grant of summary judgment in favor of appellee, Joan Bayer, on her complaint for declaratory relief.  For the reasons set forth below, the judgment of the trial court is affirmed.

**{¶ 2}** The undisputed facts relevant to the issues raised on appeal are as follows. This matter arose from what ultimately became a failed business venture between appellee Joan Bayer and appellant Joseph Nachtrab. One of the many business relationships in which Bayer and Nachtrab were involved over the years included a company known as Trans Tech Logistics, Inc. ("TTL"). Bayer and Nachtrab were equal shareholders in TTL and operated under a close corporation agreement effective January 1, 2001.

**{¶ 3}** In 2011, TTL entered into several agreements with Wells Fargo Bank, N.A., in order to finance TTL's operations, which included a line of credit, a term loan and a credit card facility. Consistent with the parties' prior practice, Bayer guaranteed one-half the total Wells Fargo debt. In late 2011, TTL and its chief customer, Quality Carriers, Inc., ("QC") negotiated a purchase transaction wherein QC sold some trucks to TTL for several million dollars. TTL financed the transaction through a master lease agreement with Fifth Third Bank. Both Bayer and Nachtrab personally guaranteed the Fifth Third debt.

**{¶ 4}** TTL's rapid expansion created various capital demands, with expenses eventually exceeding revenues for the company. In March 2012, Nachtrab separately negotiated with QC to borrow approximately $2,000,000 to prevent liquidation of TTL. However, since TTL was considered an affiliate of QC and a direct loan to TTL was effectively prohibited, QC indicated that it would be willing to lend the funds to a third party, if the third party would accept responsibility for repayment of the debt and in turn

2.

lend the funds to TTL.  Accordingly, Nachtrab planned to use another company he owned, appellant Northaven Development Group ("NDG"), as the middleman.  Pursuant to this plan, Nachtrab asked Bayer to join him in indemnifying NDG for any amount it borrowed from QC and loaned to TTL, with Nachtrab and Bayer each accepting one-half of the responsibility.  To that end, Nachtrab met with Bayer's attorney, Charles Niehaus, to discuss the prospective arrangements.  Nachtrab informed Niehaus that he would be willing to use NDG as the conduit for borrowing the funds from QC as long as Bayer agreed to pay one-half of any shortfall that ultimately resulted.  On March 28, 2012, Attorney Niehaus informed Bayer of the conditions of the contemplated note.  On March 29, 2012, Niehaus informed Nachtrab of Bayer's own demands and a meeting was planned for the day after that to discuss the loans and other matters related to the operations of TTL; that meeting took place on the morning of March 30, 2012.

{¶ 5} Much of what occurred and was discussed prior to and during this meeting is recounted in a series of, by one count, more than one thousand emails.  Excerpts from those emails will be included in this decision only to the extent relevant to this appeal.

{¶ 6} Almost immediately following the meeting on the morning of March 30, 2012, Attorney Niehaus sent Nachtrab a bullet point list summarizing their discussions and including the following reference to the QC/NDG loans:

{¶ 7} "Security for the loan from Northaven to TTL will be indemnity of one-half each from Joe and Joan (as the loan is from Northaven), TTL assets necessary to cover the face amount.  This may be influenced by Wells Fargo covenants.  * * *"

**{¶ 8}** That same afternoon, Nachtrab responded to Niehaus by email: "Chuck – I am *generally in agreement* with your bullet points. I would like to *add and clarify a few points*. I will do this weekend." (Emphasis added.)

**{¶ 9}** Following the exchange of those emails, as well as many others, Nachtrab, as manager of NDG, borrowed the money from QC unbeknownst to Bayer by executing a $2.589 million senior secured promissory note on March 30, 2012. Eventually, $4.78 million was loaned by NDG to TTL and never repaid.

**{¶ 10}** On the morning of April 2, 2012, Nachtrab sent an email to Attorney Niehaus referring to the details of the TTL loan:

> Security for the loan from Northaven to TTL will be indemnity of one half each from Joe and Joan (as the loan is from Northaven), TTL assets necessary to cover the face amount. This may be influenced by Well Fargo covenants. It is presumed that the note will be interest free to TTL as TTL has no means of paying the interest and there will be a hold back of payments at Northaven. I think we need to put interest on it even if accrued. I think Wells will be OK with this as long as TTL has the cash to pay it.

**{¶ 11}** The next significant discussion regarding Bayer's alleged indemnification of the QC/TTL loan took place May 11, 2012, when Bayer and Niehaus met with Nachtrab and TTL's attorney, Ron Tice. This meeting was necessitated because Well Fargo, TTL's largest creditor, had called in its line of credit and wanted Bayer and

4.

Nachtrab to sign a forbearance agreement. During this meeting, Nachtrab again asked Bayer to sign a guarantee for the NDG loan to TTL but Bayer refused. Appellant claims Bayer at that meeting "verbally confirmed" her responsibility for one-half the unpaid NDG obligation. In an email later that day, Bayer again told Nachtrab she would not put any more money into TTL.

{¶ 12} On May 23, 2012, Attorney Tice forwarded several agreements for Bayer to sign, including a final forbearance agreement submitted by Wells Fargo and a written indemnification agreement as to NDG for the QC/TTL loan. Bayer refused to sign the documents. On May 29, 2012, Nachtrab sent Niehaus an email asking whether or not Bayer would sign the indemnification agreement.

{¶ 13} At the same time Nachtrab was addressing issues on behalf of TTL with both QC and Wells Fargo, he and his counsel were negotiating on his personal behalf with respect to Nachtrab's ongoing relationship with Bayer. On July 10, 2012, Bayer and Nachtrab executed a Governance and Option Agreement ("GOA"), which attempted to wind up their relationship in TTL, in which Bayer agreed to vest in Nachtrab sole authority and responsibility for the management of TTL and to resign any positions held as director and officer of TTL. The GOA also gave Nachtrab authority to sell all, or substantially all, of TTL's assets upon such terms as he might approve.

{¶ 14} After he signed the GOA, Nachtrab learned that his efforts to remake or refinance TTL would be substantially hindered as QC determined that it would be in its

5.

best interest to terminate its existing agreement with TTL and assume TTL's customer base.

{¶ 15} On July 11, 2012, under a Loan, Guaranty and Membership Interest Pledge Agreement, NDG borrowed from QC the sum of $1,920,000 and an additional $714,000 under a working capital line established by the aforementioned agreement. Also on July 11, 2012, NDG purchased and Wells Fargo sold, assigned and transferred to NDG all its rights, title and interest in and to the revolving line of credit note and Bayer's guaranty for the sum of $1,771,201. Effective October 17, 2012, TTL sold substantially all of its assets to QC. The terms of the purchase, however, were insufficient to pay the entire NDG debt, resulting in a deficiency in excess of $4.5 million, exclusive of interest and fees. Thereafter, NDG, led by Nachtrab, began making demands upon Bayer to pay on the defaulted Wells Fargo line of credit it had purchased and for indemnification of the loans NDG had made to TTL.

{¶ 16} On August 24, 2012, Bayer filed a complaint for declaratory relief against Nachtrab and NDG, asking the trial court to declare that she had no duty to indemnify either or both defendants in connection with the NDG loan to TTL. Bayer further requested a declaration that Nachtrab breached the GOA to satisfy the line of credit owed by TTL to Wells Fargo, and further, that to the extent NDG acquired a judgment against her regarding the guaranty of the Wells Fargo line of credit, Nachtrab was obligated to satisfy any such judgment. NDG answered and counterclaimed for one- half the amount that it had loaned to TTL. Nachtrab answered, denying liability.

6.

{¶ 17} On March 4, 2013, Bayer moved for summary judgment as to all claims in her complaint and as to all counterclaims asserted by NDG. Nachtrab and NDG filed a joint memorandum in opposition on March 22, 2013, and Bayer filed a timely reply.

{¶ 18} The trial court heard oral argument on the motion on April 25, 2013. Both parties thereafter filed supplemental briefs at the request of the court. On June 21, 2013, the trial court granted Bayer's request for declaratory relief and dismissed one of NDG's two counterclaims. The trial court held that the essential elements of an agreement to indemnify had not been satisfied, finding that what Niehaus called his "going forward agreement" was an offer which was never accepted. The trial court concluded that because Nachtrab attempted to add other material terms after the March 30, 2012 meeting, principally the amount to be included in the indemnity and the issue of interest—both of which the trial court held to be "not inconsequential"—there could not be an agreement as a matter of law. Further, the trial court held that there was no meeting of the minds on essential terms of the amount to be indemnified and the interest to be charged and that the arguments made by NDG and Nachtrab amounted to little more than a contention that they "thought" there was an agreement.

{¶ 19} On September 17, 2013, NDG dismissed its one remaining counterclaim; the following day it filed a timely notice of appeal.

7.

{¶ 20} Appellants now set forth the following assignments of error:

Assignment of Error No. 1: The trial court erred prejudicially in ruling as a matter of law that no reasonable mind could conclude that there was an express oral agreement made between two business partners of a struggling commercial venture to share losses equally if a recapitalization effort proved unsuccessful. [Opinion and Judgment Entry at 23-34.]

Assignment of Error No. 2: The trial court erred prejudicially in ruling as a matter of law that contemporaneously executed transaction agreements which imposed different and contradictory obligations created no ambiguity in construction or interpretation, depriving appellants of their right to trial by jury on that claim. [Opinion and Judgment Entry at 34-39.]

{¶ 21} In support of their first assignment of error, appellants assert that summary judgment was improper because a jury should have been allowed to decide whether on March 30, 2012, Bayer promised to indemnify any and all loans NDG made to TTL. Appellants assert this court has held that the determination of an oral agreement is a question of fact for the jury, citing to *Schafer v. Soderberg & Schafer*, 196 Ohio App.3d 458, 2011-Ohio-4687, 964 N.E.2d 24 (6th Dist.). The contract at issue in *Schafer*, however, was written; the question at issue there was the intent of the parties and the meaning of various terms. The trial court in this case properly distinguished *Schafer* based on the alleged agreement herein being oral. The rationale in *Schafer* cited by appellants simply does not stand for the proposition that a trial court cannot make a

8.

finding that there are no issues of fact as to the existence of a meeting of the minds, as the trial court in this case found. *Schafer* states:

> In considering the intent of the parties and the meaning of the various terms of a written contract, this court reasoned that the trial court must look to all the evidence for facts that define the agreement and evidence as to whether the parties intended to be bound. This court has not held that questions as to the existence of an oral contract are solely for a jury to decide, as appellant asserts. To hold that a jury must in all cases make such determinations would simply overlook the standard and law regarding summary judgment motions.

**{¶ 22}** This court has held that if the undisputed facts demonstrate that there was no meeting of the minds, summary judgment is appropriate. In *Adams v. Windau*, 6th Dist. Lucas No. L-08-1041, 2008-Ohio-5023, ¶ 24, this court affirmed summary judgment on the trial court's finding that appellant had not established that the parties had a meeting of the minds sufficient to establish that a contract existed. In *Delta Fuels, Inc. v. Consolidated Environmental Servs., Inc.*, 6th Dist. Lucas No. L-08-1186, 2009-Ohio-1740, ¶ 24, we affirmed the trial court's finding that there was no meeting of the minds so as to constitute mutual assent to the terms of an alleged contract. Additionally, in *Mid Am Bank v. Dolin*, 6th Dist. Lucas No. L-04-1033, 2005-Ohio-3353, ¶ 76, we affirmed the trial court's finding that there was no meeting of the minds as to the extent of certain loan guarantees.

9.

{¶ 23} As this court found in *Delta Fuels, supra*, if the record bears no objective or compelling evidence that the parties assented to all of the essential terms of a contract, the trial court is within its authority to grant summary judgment. Having established that the trial court herein had authority to grant summary judgment if the facts supported it, we will consider whether appellants established that the trial court's factual findings were incorrect.

{¶ 24} The trial court found that there was no meeting of the minds between the parties as to all of the essential terms relating to Bayer's alleged promise to guarantee the NDG loans to TTL. The trial court based its decision on its finding that on and after March 30, 2012, while there were many ongoing discussions and negotiations between the parties, there was no evidence that an agreement had ever been finalized.

{¶ 25} The fundamental issue before the trial court and now before this court is whether Bayer and Nachtrab ever entered into a contract requiring Bayer to indemnify one-half of the NDG loans from QC.

{¶ 26} A contract is a promise or set of promises for breach of which the law provides a remedy, or the performance of which the law in some way recognizes as a duty. *Cleveland Builders Supply Co. v. Farmers Ins. Group of Cos*., 102 Ohio App.3d 708, 712, 657 N.E.2d 851 (8th Dist.1995). "Three types of contractual obligations have been historically recognized by Ohio courts: express, implied in fact, and implied in law." *Dinunzio v. Murray*, 11th Dist. Lake No. 2003-L-213, 2005-Ohio-4047, ¶ 17. "In an implied-in-fact contract, 'the meeting of the minds is shown by the surrounding

10.

circumstances that demonstrate that a contract exists as a matter of tacit understanding.'" *Id.,* citing *Vargo v. Clark,* 128 Ohio App.3d 589, 595, 716 N.E.2d 238 (4th Dist.1998).

{¶ 27} In this case, if a contract exists, it would be "implied-in-fact" as there was no written document signed by the parties. Thus, the issue becomes whether a "meeting of the minds" between Bayer and Nachtrab can be shown by the surrounding circumstances which obligated each of them to perform on certain promises.

{¶ 28} It is well-settled that an appellate court reviews a trial court's granting of summary judgment de novo, applying the same standard used by the trial court. *Lorain Natl. Bank v. Saratoga Apts.,* 61 Ohio App.3d 127, 129, 572 N.E.2d 198 (9th Dist.1989); *Grafton v. Ohio Edison Co.,* 77 Ohio St.3d 102, 105, 671 N.E.2d 241 (1996). Summary judgment will be granted when there remains no genuine issue of material fact and, when construing the evidence most strongly in favor of the non-moving party, reasonable minds can only conclude that the moving party is entitled to judgment as a matter of law. Civ.R. 56(C ).

{¶ 29} Here, we find no evidence that there was a meeting of the minds sufficient to establish that Bayer agreed to guarantee the loans in question. A purported agreement cannot be enforced in the absence of a demonstration of a meeting of the minds. *Kostelnik v. Helper,* 96 Ohio St.3d 1, 2002-Ohio-2985, 770 N.E. 2d 58. There is no persuasive evidence in the record demonstrating a meeting of the minds so as to constitute mutual assent. Therefore, we find that the trial court did not err when it granted summary judgment to Bayer on that basis. We further find that there remains no

11.

other genuine issue of material fact, and, after considering the evidence presented most strongly in favor of appellants, appellee is entitled to summary judgment as a matter of law. Appellants' first assignment of error is not well-taken.

{¶ 30} In support of their second assignment of error, appellants assert that the trial court erred by finding that there was no ambiguity between the terms of the Wells Fargo Modification Agreement and the Governance and Option Agreement and by finding that Nachtrab breached the GOA by failing to pay in full the line of credit owed by TTL to Wells Fargo.

{¶ 31} On July 3, 2012, TTL, Bayer and Nachtrab entered into the Modification Agreement with Wells Fargo to buy TTL more time to pay its debt. The result of that Modification Agreement was threefold: some debt was paid off by QC/NCG loans, TTL recommitted to other debt, and Bayer and Nachtrab recommitted to existing personal guarantees. The Modification Agreement identified two categories of Bayer/Nachtrab guarantees. The first related to two notes referred to as "TTL Notes" and Bayer's guarantee of those notes was called "Bayer Guarantee." The second Bayer guarantee was the line of credit. Pursuant to the Modification Agreement, Nachtrab was to have NDG purchase the line of credit and along with it the second Bayer guarantee. Bayer would be left with a personal guarantee on the TTL notes held by Wells Fargo and a guarantee on the line of credit which would be held by NDG. It is the line of credit note, the second Bayer guaranty, which NDG sought to enforce against Bayer.

12.

{¶ 32} A few days after executing the Modification Agreement with Wells Fargo, Bayer and Nachtrab negotiated and entered into the GOA, which attempted to wind up their relationship in TTL. Under that agreement, Bayer agreed to vest in Nachtrab sole authority and responsibility for the management of TTL; Bayer would resign any position held as director and officer of TTL. The GOA included the following statements: 1) Wells Fargo had demanded an immediate payoff of Trans Tech's revolving line of credit and had granted Trans Tech until December 31, 2012, to refinance or pay in full Trans Tech's remaining obligations to it; and 2) Nachtrab was willing to provide sufficient funds to satisfy Trans Tech's line of credit and attempt to refinance Trans Tech's obligations to Wells Fargo and Fifth Third and TTL Properties' obligations to Wells Fargo if given discretion to operate Trans Tech on an interim basis and if Bayer granted him a Purchase Option.

{¶ 33} In summary, Nachtrab was to pay off the line of credit held by NDG and make his best efforts to refinance the "remaining obligations" held by Wells Fargo and Fifth Third in exchange for complete control of TTL and an option to buy out Bayer at a discounted price.

{¶ 34} While appellants claim that the written terms of the GOA are ambiguous, the only "ambiguity" they identify is that the Modification Agreement requires NDG to purchase the line of credit from Wells Fargo and the GOA requires Nachtrab to cause NDG to pay it in full. As the trial court found, those terms are not ambiguous and they do not conflict since both can be enforced. The trial court concluded that the purchase by

13.

NDG of the Wells Fargo line of credit did not affect the obligation Nachtrab made in the governance agreement to pay the line of credit in full. The consequences of that allow NDG to pursue its claim against Bayer for breach of her continuing guaranty but also obligate Nachtrab to satisfy any judgment obtained by NDG against Bayer for her portion of the line of credit under her personal guaranty.

{¶ 35} Accordingly, appellant's second assignment of error is not well-taken.

{¶ 36} On consideration whereof, the judgment of the Lucas County Court of Common Pleas is affirmed. Costs of this appeal are assessed to appellants pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Thomas J. Osowik, J.                    _____
                                                          JUDGE
Stephen A. Yarbrough, P.J.

James D. Jensen, J.                     _____
CONCUR.                                              JUDGE

                                        _____
                                                          JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.sconet.state.oh.us/rod/newpdf/?source=6.