[Cite as *Southeast Land Dev., Ltd. v. Primrose Mgt. L.L.C.*, 193 Ohio App.3d 465, 2011-Ohio-2341.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## HANCOCK COUNTY

SOUTHEAST LAND
DEVELOPMENT, LTD.,

    APPELLANT,

    v.

PRIMROSE MANAGEMENT,
L.L.C., ET AL.,

    APPELLEES.

CASE NOS.  5-10-04
               5-10-11

O P I N I O N

**Appeals from Hancock County Common Pleas Court**
**Trial Court No. 2006 CV 00720**

**Judgments Affirmed in Part, Reversed in Part and Causes Remanded**

**Date of Decision:  May 16, 2011**

APPEARANCES:

    Matthew C. Huffman and Michael J. Warrell, for appellant.

    James K. Wagner and Ronald A. Parsons Jr.,  for appellees.

WILLAMOWSKI, Judge.

**{¶ 1}** These appeals are brought by plaintiff-appellant, Southeast Land Development, Ltd. ("Southeast"), from judgments of the Court of Common Pleas of Hancock County. For the reasons set forth below, the judgments are affirmed in part and reversed in part.

**{¶ 2}** On March 17, 2005, Southeast accepted an offer from Primrose Management, L.L.C. ("Primrose") to purchase ten acres of undeveloped real estate in Hancock County for $500,000. Closing was to be within 120 days of either the approval of the planned-use development ("PUD") or the rezoning of the property, whichever was later. As part of the purchase agreement, Southeast agreed to provide the following infrastructure improvements to the property on or before May 31, 2006.

> A. A dedicated right-of-way and improved street including approved curb cuts, to be located along the south lot line of the property.

> B. Infrastructure, including a lift station, of sufficient size and capacity for Buyer's intended use of the Property, connected to the sanitary sewer system of the City of Findlay, Ohio, shall be available at the lot line of the Property. Buyer shall be responsible for any connection of tap fees.

> C. Infrastructure of sufficient size and capacity for Buyer's intended use of the Property, connected to the water system of the City of Findlay, Ohio, shall be available at the lot line of the Property. Buyer shall be responsible for any connection or tap fees.

> D. Infrastructure of sufficient size and capacity for electrical and gas service for Buyer's intended use of the Property, connected to

the appropriate utility provider, shall be available at the lot line of the Property. Buyer shall be responsible for any connection fees.

E. Prior to September 1, 2005, or commencement of construction, which ever [sic] is latter [sic]. Seller shall provide temporary electrical and water service at the lot line of the Property, of sufficient size and capacity, so that Buyer can construct its Senior Retirement Community Project.

F. Seller must act in a diligent, reasonable, and good faith manner in completing the installation of the infrastructure improvements. Seller shall continuously monitor the progress of the construction of Buyer's Senior Retirement Community facility so that the infrastructure improvements are completed in a timely manner in accordance with this agreement.

The contract also provided that Southeast had the right to retain any excess soil and that it had 30 days from Primrose's written notice of excess soil to remove the soil before the right terminated. Primrose assigned the contract to Findlay Retirement, L.L.C., on February 2, 2006.

{¶ 3} On February 20, 2006, the contract was modified. The modifications indicated that the electrical service had been made available at the lot line and that Southeast had therefore satisfied that requirement of the contract. The time for providing water service was extended to August 1, 2006, but required Southeast to provide a temporary holding tank if it was not provided by June 1, 2006. The time for the roadway curbs, sewer service, and gas service was extended until October 1, 2006. The modification also provided that the closing date would be February

17, 2006, and that time was not of the essence.[1]  The closing actually occurred on March 9, 2006.

{¶ 4} In April 2006, Primrose began working the site for its retirement-home project.  On or about May 4, 2006, Matt Carpenter, the assistant chief engineer for the city of Findlay, issued a "stop work" order.  The reasons for the order were that no bonds had been posted by any party.  A meeting was held on May 17, 2006, to determine what steps to take.  After the meeting, Jim Thares, the owner and president of Primrose, determined that Luke Theis, a part owner of Southeast, was noncommittal about continuing with the PUD.  He then requested that Todd Jenkins, an engineer project manager for Peterman Associates, prepare plans for an independent project.  These plans were then submitted to the city of Findlay for approval on June 1, 2006.  These plans were approved at the end of June 2006, and Primrose posted the necessary construction bonds in July 2006.  Southeast did not post its bond.  Primrose then proceeded with its independent project.

{¶ 5} In June or July 2006, Primrose's excavator wanted to remove the excess soil from the site.  He placed two phone calls to Theis to see if he wanted the soil.  Theis told him he would check and get back to him.  Within the next couple of days, the excavator removed the excess soil and gave it to a third party.

---

[1]  Although the modification set a closing date of February 17, 2006, Primrose did not sign it until February 20, 2006, and Southeast did not sign it until February 23, 2006.

{¶ 6} On November 28, 2006, Southeast filed a complaint for breach of contract against Primrose. Southeast alleged that Primrose had breached the agreement by filing its own plans to construct the utilities and changing the layouts and by giving away the soil, which the contract specifically stated was Southeast's property. On January 2, 2007, Primrose filed its answer and a counterclaim alleging that Southeast had anticipatorily breached the contract. On January 30, 2007, Southeast filed its answer to the counterclaim. A trial was held on the issues from April 28 through April 30, 2008. Both parties filed their posttrial briefs on September 2, 2008. On June 5, 2009, the trial court entered judgment in favor of Primrose on all claims. Southeast filed its notice of appeal from this judgment on July 2, 2009. On January 15, 2010, the trial court granted Primrose's application for attorney fees. Southeast filed its notice of appeal from this judgment on February 16, 2010. The two appeals were combined for argument purposes, and the following assignments of error are raised.

**First Assignment of Error**

The trial court erred in finding that [Southeast] committed an "anticipatory repudiation" of the Agreement.

**Second Assignment of Error**

The trial court erred in finding that [Southeast's] own actions constitute an absolute defense to [Southeast's] breach of contract claims asserted against [Primrose].

**Third Assignment of Error**

The trial court erred in failing to award reasonable attorneys' fees in this matter to [Primrose].

{¶ 7} In the first assignment of error, Southeast alleges that the trial court erred in finding that it committed an anticipatory breach of the contract. Southeast argues that the evidence does not support the claim of anticipatory breach. "Judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence." *C.E. Morris Co. v. Foley Constr. Co.* (1978), 54 Ohio St.2d 279, 376 N.E.2d 578, at syllabus.

> The civil manifest weight of the evidence standard "affords more deference to the fact-finder" than is afforded in criminal cases. *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶26. The civil standard "tends to merge the concepts of weight and sufficiency." Id. In determining whether a civil judgment is against the manifest weight of the evidence, an appellate court does not reweigh the evidence. Id.

*H. Park Partners, L.L.C. v. Frick*, 181 Ohio App.3d 691, 2009-Ohio-1462, 910 N.E.2d 527, ¶20.

> Where one party to a contract refuses to perform under the terms of the contract, an anticipatory repudiation is said to occur. [*Blake Homes, Ltd. v. FirstEnergy Corp.*, 173 Ohio App.3d 230, 2007-Ohio-4606, 877 N.E.2d 1041.] An anticipatory breach of contract by a promisor is a repudiation of the promisor's contractual duty before the time fixed for performance has arrived. [*Metz v. Am. Elec. Power Co., Inc.*, 172 Ohio App.3d 800, 2007-Ohio-3520, 877 N.E.2d 316.] An anticipatory breach of contract is one committed before the time has come when there is a present duty of

performance and is the outcome of words or acts evincing an intention to refuse performance in the future. [*McDonald v. Bedford Datsun* (1989), 59 Ohio App.3d 38, 570 N.E.2d 299.] An anticipatory breach of contract must be an unequivocal repudiation of the contract. [*Sentinel Consumer Prod., Inc. v. Mills, Hall, Walborn & Assoc., Inc.* (1996), 110 Ohio App.3d 211, 673 N.E.2d 967.] A mere request for a change in terms or for cancellation does not constitute a repudiation. [*McDonald*, supra.] Similarly, a mere expression of doubt as to willingness or ability to perform is insufficient to constitute repudiations of a contract. [*Farmers Comm. Co. v. Burks* (1998), 130 Ohio App.3d 158, 719 N.E.2d 980.] "Repudiation" of a contract is (1) a statement by the obligor to the obligee indicating that the obligor will commit a breach that would of itself give the obligee a claim for damages for total breach, or (2) a voluntary affirmative act which renders the obligor unable or apparently unable to perform without such a breach. [*White Hat Mgt. L.L.C. v. Ohio Farmers Ins. Co.,* 167 Ohio App.3d 663, 2006-Ohio-3280, 856 N.E.2d 991.] * * * A party voluntarily disabling himself or herself from performing gives the other party an immediate cause of action. * * *

If a party has reasonable grounds to believe that the other party will not perform under the contract, that party may demand adequate assurance of performance from the other; the failure to provide such assurance is treated as a repudiation of the contract. [*Burke v. Athens* (1997), 123 Ohio App.3d 98, 703 N.E.2d 804.]

* * *

To prevail on a claim of anticipatory breach of contract, a plaintiff must establish that there was a contract containing some duty of performance not yet due, and that by word or deed, the defendant refused future performance, causing damage to the plaintiff. [*Metz*, supra].

18 Ohio Jurisprudence 3d (2011), Contracts, Section 237. If an anticipatory breach of contract is found to occur, the injured party has the option of either

terminating the contract and suing the breaching party immediately or continuing the contract and suing the breaching party for damages after the time for performance has passed. 18 Ohio Jurisprudence 3d (2011), Contracts, Section 238. See also *Gilmore v. Am. Gas Mach. Co.* (1952), 70 Ohio Law Abs. 569, 129 N.E.2d 93; *Roehm v. Horst* (1900), 178 U.S. 1, 20 S.Ct. 780, 44 L.Ed. 953; and *Hettrick Mfg. Co. v. Waxahachie Cotton Mills* (1924), 1 F.2d 913.

{¶ 8} A meeting was held on May 17, 2006, to discuss the stop-work order. At that meeting, Theis was questioned concerning the future of the project and when he would get his bonds posted. Theis testified that he could not post his bond until the plans were approved and he did not know when that would occur. Thares testified that he determined after the meeting that he did not think Theis was committed to proceeding with the project. Thares then instructed the engineer to create alternative plans for a facility separate from Theis's plan. These plans were submitted to the city on June 1, 2006. The approval of the plans was received at the end of June 2006, and the bond was posted at the beginning of July, 2006. Once the bond was posted, Theis lost the ability to have his plans approved and perform under the contract. Although Thares admits he never asked Theis directly whether he intended to complete the contract, he testified that when he called Theis in July, Theis informed him that he would not be able to meet the

deadlines. Thares also admitted that Theis never told him one way or another whether he intended to go forward with the project.

{¶ 9} Robert Miller, the project manager for Charles Construction, was also at the May 17, 2006, meeting. He recalled that when Theis was questioned about posting the bond, he said that he would talk to the company owner.[2] Jenkins had a similar recall of the events at the meeting. He testified that Theis said he was not sure what he was going to do about the bonds. He also testified that sometimes the bond is posted before the approval and sometimes it is not posted until after. Posting the bond before approval was the riskier option. He also testified that Theis never indicated to him that he did not intend to go forward with the project. Jenkins also did not have any idea why the approval of Theis's plans took so long. Also at the meeting was Carpenter. He testified that Southeast had submitted its plans to the city for review before the June 2005 meeting. The plans were not approved until June 2006, but no bond was posted. Like Miller, Carpenter recalled that Theis was asked when Southeast would post its bond. He recalled that Theis indicated that he would have to check with his business partners. No question concerning whether Theis would continue the project occurred.

{¶ 10} The evidence in this case does not indicate that Theis or any other representative of Southeast said that they would not perform under the contract.

---

[2] At that time, Theis only owned 5 percent of the company.

Theis merely expressed doubts about his ability to perform the contract by the deadline due to issues with getting his plans approved. The mere expression of doubt about ability to perform is not a repudiation of the contract. However, there is some competent, credible evidence that could be considered a repudiation of the contract in the voluntary actions taken by Theis. The testimony of Jenkins and Carpenter was that Southeast's plans were approved in June, although stamped copies were never sent. Once the plans were approved, Southeast could have posted the construction bond. The plans of Primrose were approved on the contingency that Southeast did not post its bond before Primrose did. Southeast did not post its bond before Primrose posted its bond on July 7, 2006. Thus, Primrose's plans became the ones used and Southeast was barred from proceeding. Southeast could have posted its bond before Primrose, but did not do so. Therefore, the trial court's determination is supported by some competent, credible evidence and will not be reversed on appeal. The first assignment of error is overruled.

{¶ 11} In the second assignment of error, Southeast alleges that the trial court erred in determining that Primrose's breach of the contract was excused by the anticipatory breach. As discussed above, when an anticipatory breach of the contract occurs, the injured party can either treat the contract as terminated and sue for damages or it can continue with the contract and sue for damages after the time

for performance has passed. However, if one chooses to continue with the contract rather than terminating it, that party must perform all the conditions of the contract to be performed by him or her. *Hettrick*, 1 F.2d 913.

> The promisee, if he pleases, may treat the notice of intention as inoperative, and await the time when the contract is to be executed, and then hold the other party responsible for all the consequences of nonperformance; but in that case he keeps the contract alive for the benefit of the other party as well as his own; he remains subject to all his own obligations and liabilities under it * * *.

*Roehm*, 178 U.S. at 11. Although the case cited may be old, the logic is valid. Take for example, a contract between A and B for A to sell B his house and B to pay for the house. As part of the contract, A has the right to keep a chandelier and replace it with another within two weeks. If A takes the chandelier and tells B that he is not going to replace it, B has two choices. B can terminate the contract and sue A for any damages. B's other choice is to wait until the time for performance has passed and then sue A for the damages. However, B must still perform its obligations under the contract and pay for the house. In other words, the injured party can either terminate the entire contract, which extinguishes its duties, or it can continue with the contract which requires that it fulfill its obligations under the contract as well. To allow a party to use the prior breach of the other party as a reason not to perform any of its duties while continuing the contract would lead to very inequitable results. In the example used above, it would permit B to obtain

the house without the obligation of paying for it, which was not the original intent of the contract.

{¶ 12} The contract in this case was a contract for the sale of real estate along with some construction provisions. The contract contained the following provision.

> The Property shall be conveyed to Buyer or Buyer's nominee free and clear of any liens, encumbrances, mortgages, easements, or special taxes or assessments * * * except for the rights of the Seller to retain excess soil excavated by Buyer from the real estate to be conveyed herein. Seller (sic) rights to retain excess soil for its use shall not however conflict with the Buyer's development of the real estate in questions, and should Seller fail to exercise its rights to remove excess dirt from the real estate to be conveyed to Buyer herein within thirty (30) days of Buyer's written notification to remove said dirt, the rights of Seller shall terminate and Buyer shall have the right to have the excess dirt removed from the real estate.

At the time of the anticipatory breach, Primrose did not choose to terminate the contract and seek damages. Instead, Primrose continued with the contract by retaining possession of the property and having the performance completed by a third party. Primrose then sued for damages caused by the breach. This choice is permitted. However, by continuing the contract, Primrose is required to abide by *all* the terms of the contract, not just the ones that benefit it.

{¶ 13} Primrose argues that because Southeast anticipatorily breached the contract, it is not liable for any subsequent breaches. In support of this argument, Primrose relies upon *Farmers Comm. Co. v. Burks* (1998), 130 Ohio App.3d 158,

719 N.E.2d 980. In *Farmers*, there was a contract for the farmer to sell corn to the commission, which is a sale of goods, not real estate. The farmer anticipatorily breached the contract and the commission chose to terminate the contract and sue for damages immediately. This is one of the two options available to the injured party when a contract is anticipatorily breached. However, this is not the option chosen by Primrose. Thus, the holding in *Farmers* is not applicable to this case. Primrose was required to complete its obligations under the contract.

{¶ 14} Ten thousand eight cubic yards of soil were removed from the site. Prior to the removal of the soil, the subcontractor contacted Theis by telephone about removing the soil. When no response was received within a couple days, the soil was removed and given to a third party for fill dirt. The parties all agree that no written notice concerning the soil was ever given to Southeast. Thares testified that the soil was not usable as compactible fill dirt. However, he admitted that it was given to the neighbor to use as fill and that he did not know what Theis wanted to do with the soil. Theis testified that he wanted the soil, which was sandy, to mix for baseball diamonds. The soil was worth $25 per cubic yard for that purpose. The evidence of value provided by Theis was not contradicted by anyone, since the only other testimony about the value was that it had no value as compactible filler, not that it had no value for any other purpose. Given that there is no question that Primrose chose to continue the contract and sue for damages;

Primrose had a duty to fulfill its obligations under the contract. This means that Primrose had a duty to send Southeast written notice that the excess soil should be removed within 30 days. Until the written notice was given and the 30 days had passed, Primrose did not own the soil it removed. By giving it to the neighbor before Southeast's rights had terminated, Primrose basically committed conversion of Southeast's property. At $25 per cubic yard, the value of this property to Southeast would have been $250,200. Thus, the trial court erred in finding that Primrose had not breached the contract as well.[3] The second assignment of error is sustained.

{¶ 15} The final assignment of error raises the question whether the trial court improperly awarded attorney fees.

> Pursuant to the "American Rule," each party in a lawsuit must generally bear its own attorney fees. *Sorin v. Bd. Of Edn. Of Warrensville Hts. School Dist.* (1976), 46 Ohio St.2d 177, 179, 75 O.O.2d 224, 347 N.E.2d 527. However, a court may be empowered to award attorney fees where there is a contractual agreement between the parties to shift fees. *McConnell v. Hunt Sports Ent.* (1999), 132 Ohio App.3d 657, 699, 725 N.E.2d 1193. Fee-shifting contractual provisions are generally enforceable "so long as the fees awarded are fair, just and reasonable as determined by the trial court upon full consideration of all of the circumstances of the case." *Wilborn v. Bank One Corp.*, 121 Ohio St.3d 546, 549, 2009-Ohio-306, 906 N.E.2d 396, at ¶8, quoting *Nottingdale Homeowners' Assn. v. Darby* (1987), 33 Ohio St.3d 32, 514 N.E.2d 702, syllabus.

---

[3] The trial court does find that Southeast had time to remove the soil and was notified verbally. However, the contract specifically provides that Primrose will give Southeast written notice and that he will have 30 days to remove the soil, not a couple of days. Until the contract terms were met, Primrose had no ownership rights to that soil.

-14-

*Unick v. Pro-Cision, Inc.*, 7th Dist. No. 09-MA-171, 2011-Ohio-1342, ¶ 25.

Although a contractual provision may entitle a prevailing party to attorney's fees, the prevailing party still has the burden of proving the reasonableness of the fees. *Stonehenge Land Co. v. Beazer Homes Invests., L.L.C.*, 177 Ohio app.3d 7, 2008-Ohio-148, 893 N.E.2d 855, at ¶45. A trial court's determination of reasonable attorney's fees must generally begin with a calculation of "the number of hours reasonably expended on the case times an hourly fee." *Bittner [v. Tri-County Toyota, Inc.* (1991), 58 Ohio St.3d 143, 145, 569 N.E.2d 464]. This "lodestar figure" has been determined to be "[t]he most useful starting point for determining the amount of a reasonable fee," because it "provides an objective basis on which to make an initial estimate of the value of a lawyer's services." *Hensley v. Eckerhart* (1983), 461 U.S. 424, 433, 103 S.Ct. 1933, 1939, 76 L.Ed.2d 40. See, also, *Gisbrecht v. Barnhart* (2002), 535 U.S. 789, 800-802, 122 S.Ct. 1817, 152 L.Ed.2d 996.

In order to establish this minimum baseline for the determination of attorney fees, the party requesting the award bears the burden of providing evidence of any hours worked that would be properly billed to the client. The hours worked should be necessary to the action and should not include "hours that are excessive, redundant, or otherwise unnecessary." *Hensley* at 434. The requesting party "should exercise 'billing judgment' with respect to hours worked, * * * and should maintain billing time records in a manner that will enable a reviewing court to identify distinct claims." *Hensley* at 437 (citations omitted). * * *

* * * "[T]he burden is on the fee applicant to produce satisfactory evidence – in addition to the attorney's own affidavits – that the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation." *Blum v. Stenson* (1984), 465 U.S. 886, 895-896, 104 S.Ct. 1541, 79 L.Ed.2d 891, at fn. 11.

Once the requesting party has adequately proven an appropriate number of hours worked and the attorney's reasonable hourly fee, the trial court may modify the baseline calculation by considering

the factors * * * found in Prof. Cond.R. 1.5, which include "the time and labor involved in maintaining the litigation; the novelty and difficulty of the questions involved; the professional skill required to perform the necessary legal services; the attorney's inability to accept other cases; the fee customarily charged; the amount involved and the results obtained; any necessary time limitations; the nature and length of the attorney/client relationship; the experience, reputation, and ability of the attorney; and whether the fee is fixed or contingent. * * *" *Bittner* [58 Ohio St.3d] at 145-146, [569 N.E.2d 46].

*Unick*, 2011-Ohio-1342, at ¶ 27-30. If all elements of the required proof are not provided, the trial court may deny the request for attorney fees in its entirety. Id. at ¶ 33.

{¶ 16} The reason for the award of attorney fees was that the contract provided for them.

If any legal action, appeal, mediation, arbitration, or other proceedings are initiated to enforce or interpret this Agreement, the prevailing party shall be entitled to recover reasonable attorney and paralegal fees, court costs, and other reasonably incurred expenses, in addition to any other relief to which such party may be entitled. "Prevailing party" means the party who obtains the greater part, comparatively, of the relief sought by each, whether by compromise and settlement, mediation, or a determination by any court or arbitrator. The fees, costs, and expenses shall be included in, and be a part of, any settlement, order, judgement (sic), or other determination, which shall also provide for the recovery of any fees, costs, and expenses incurred in enforcing such settlement, order, judgement (sic) or determination.

Here, the evidence of the attorney fees were billing statements and an application for attorney fees with an affidavit of the attorney attached. No additional

-16-

information was provided by Primrose to indicate that the requested rates were in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation. See *Blum*, 465 U.S. 886. Additionally, a review of the statements provided shows that there were instances where items were billed that may not have been reasonable. The attorneys for Primrose billed for drafting of letters by associates and then review of the letters by a partner, for researching nursing-home law, when the issue before the court was a mere construction contract, not the running of a nursing home, for researching a worker's compensation claim, which was also not an issue, for docketing answer dates, for daily phone calls to the court to check on the status, and for a new associate to review all the information prepared by a prior associate when the firm changed associates, even though the head attorney had not changed. Some of these entries seem to be nothing more than a necessary cost of business and thus not a cost of this case. No hearing was held on the matter, and the trial court did not indicate in any way that it had considered the factors set forth in Prof.Cond.R. 1.5 or reviewed the reasonableness of the fees.

{¶ 17} Moreover, because this court sustained the second assignment of error, the outcome of the case is affected. Pursuant to the terms of the contract, only the prevailing party is entitled to attorney fees. The trial court must now reassess which party, if any, is the prevailing party for the purpose of attorney fees

or if attorney fees are even justified under the facts of the case. For this reason, the third assignment of error is sustained.

{¶ 18} The judgment of the Court of Common Pleas of Hancock County appealed in appellate case No. 5-10-04 is affirmed in part and reversed in part. The judgment of the Court of Common Pleas of Hancock County appealed in case No. 5-10-11 is reversed. The matters are remanded to the trial court for further proceedings.

So ordered.

ROGERS, P.J., and PRESTON, J., concur.