NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 17a0287n.06

Nos. 15-4385, 15-4400, 16-3002

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
May 23, 2017
DEBORAH S. HUNT, Clerk

| | |
|---|---|
| ATLAS NOBLE, LLC, | ) |
| | ) |
| Plaintiff-Appellant/Cross-Appellee, | ) |
| | ) ON APPEAL FROM THE |
| v. | ) UNITED STATES DISTRICT |
| | ) COURT FOR THE |
| KRIZMAN ENTERPRISES, MKE | ) NORTHERN DISTRICT OF |
| PRODUCING, INC., and WAYNE HAMMOND | ) OHIO |
| ENTERPRISES, INC., | ) |
| | ) |
| Defendants-Appellees/Cross-Appellants; | ) |

BEFORE: GIBBONS, COOK, and KETHLEDGE, Circuit Judges.

**JULIA SMITH GIBBONS, Circuit Judge.** This case revolves around an agreement to buy and sell oil-and-gas leases entered into by Atlas Noble, LLC ("Atlas" or "buyer") and Krizman Enterprises, MKE Producing, Inc., and Wayne Hammond Enterprises, Inc. (collectively "Krizman" or "sellers"). Each blames the other for the failure of the deal. The district court found that Atlas anticipatorily repudiated the agreement and that this repudiation entitled the sellers to the earnest money in the escrow account—but nothing more—because the court construed the agreement's earnest-money provision as a liquidated-damages clause. The district court also denied Beau Croxton's motion to intervene.

The district court resolved most of this matter correctly. It was right to construe the earnest-money provision here as a liquidated-damages clause. And the district court did not err in denying Croxton's motion to intervene. Further, it correctly found the contract required Krizman to be in a position to deliver title by 11:59 p.m. on April 3 and that Atlas anticipatorily

breached the contract by unilaterally terminating the agreement at 5:52 p.m. that same day. Krizman, however, took no further action after Atlas's 5:52 p.m. email and it, too, did not tender performance under the contract. But Atlas's repudiation of the contract may excuse Krizman's non-performance if Krizman can demonstrate that the repudiation was a material reason for its failure to tender performance. This, in turn, requires Krizman to demonstrate that it was in fact capable of performing its obligations by 11:59 p.m. on April 3. Otherwise, the parties are in mutual breach of the agreement. Because there remains a genuine dispute of material fact about whether Atlas's repudiation was a material reason for Krizman's non-performance, we reverse the district court's grant of summary judgment for Krizman on this issue and remand this matter to the district court.

I.

Atlas entered into a Purchase and Sale Agreement ("PSA") with Krizman in September 2012. The PSA provided that Krizman would sell, and Atlas would buy, certain oil-and-gas leases in Tuscarawas County, Ohio. Within three days of executing the agreement, Atlas was to place $2,411,290 into an escrow account. Initially, the contract established that the sale would close "not later than December 15, 2012 or such other date as Buyer and the Seller mutually agree in writing . . . ." (DE 1-2, PSA § 1.1, Page ID 13.)

Section 6.2 of the PSA outlined the conditions that Krizman had to meet to trigger Atlas's obligation to purchase the leases. As relevant to this dispute, § 6.2(iv) required that Krizman be able to deliver defensible title to at least 76.85 percent of the 2,414.21 acres offered for sale.[1] If the deal failed for any reason other than those contained in § 6.2, the escrowed funds went to Krizman.

---

[1] The PSA initially required that Krizman be able to deliver at least 80 percent of the acreage, but the second amendment to the PSA decreased this amount to 76.85 percent.

Atlas assumed sole responsibility for ensuring that Krizman had good title to the oil-and-gas assets Krizman was selling. To help Atlas review those assets, the PSA allowed for a "review period," by providing:

> Between the execution of this Agreement and 5:01 p.m. Eastern Standard Time on December 15, 2012 (the "Review Period"), Seller shall make available for review by Buyer and its representatives, during normal business hours, excluding weekends and holidays, all records relating to title (including contracts, correspondence, files and prior title opinions) in its possession pertaining to the Leases for purposes of permitting Buyer to review Seller's title to the Leases.

(PSA §§ 4.1 & 4.2, Page ID 19.) This was intended to provide Atlas with sufficient time to determine whether Krizman had defensible title to the requisite acreage. The PSA was twice amended to extend the time that Atlas had to review the leases. Ultimately, Atlas's review period was extended until April 3, 2013. These amendments necessitated a corresponding extension of the closing date, which was pushed back to April 3, 2013 as well. Although the PSA stated that the review period ended at 5:01 p.m., neither it nor its amendments provided an express time on April 3 by which closing had to be complete.

Section 4.2 of the PSA provided that Atlas's "sole remedy for any defect of title" was a reduction in the purchase price. (PSA § 4.2, Page ID 19.) The procedure for defect adjustments was contained in § 4.3. That section stated that "[o]n or before the end of the Review Period, Buyer, at its sole and absolute discretion, may determine to exclude all or any portion of a Lease for title related matters which will then have a corresponding impact on the Purchase Price . . . ." (PSA § 4.3, Page ID 19.) Pursuant to this section, an Atlas employee sent Krizman a letter[2] stating that Atlas had "completed its title review and ha[d] adjusted the net acres for each subject lease accordingly." (DE 58-6, Jan. 28, 2013 Letter, Page ID 2480.) The letter further stated that Atlas intended "to purchase approximately 1,861.3361 acres or 76.85% of the net acres stated in

---

[2] The parties agree that this letter was misdated "January 28, 2012." It was drafted and sent in January 2013.

the Purchase and Sale Agreement on or before the new closing date which is proposed to be April 3, 2013." (*Id*. at 2481.)

On April 2, 2013—the day before closing—Atlas sent Krizman an email, explaining the final steps Krizman needed to take regarding the remaining title defects. Specifically, Atlas asked Krizman to execute a certain modification with, and obtain a letter regarding severance tax from, the Muskingum Water Conservancy District ("MWCD"), and to take four steps regarding the Ralph Ervin lease: produce "[1 a] quit claim deed from Huntington National Bank for Croxton and Caldwell parcels totaling 118.9392 acres, [2 a] release of Ervin lease, [3] executed leases from Croxton and Caldwell totaling 118.9392 acres, [and 4] confirmation of payment of both leases." (DE 58-7, April 2, 2013 Email, Page ID 2503.)

On April 2 and into the day on April 3, Krizman worked to complete these remaining requests. The parties do not dispute that most of the necessary steps were taken with regard to MWCD, and that Krizman had received the quit-claim deeds from Huntington National Bank. Krizman asserts that it had nearly all of the final agreements in place so that all of Atlas's requests could be met, although, importantly, there is a dispute about whether Krizman could have completed all of the necessary steps that day. But, at 5:52 p.m. on April 3, Atlas emailed Krizman and indicated that it was unilaterally terminating the agreement, pursuant to § 8.1, because "Seller has failed to satisfy Section 6.3[3] of the Agreement, as amended, by the close of business on April 3, 2013, as [they have] not cleared title to more than 76.85% of the cumulative acreage totals . . . ." (DE 1-5, April 3, 2013 Termination Letter, Page ID 68.) After receipt of this email, Krizman took no further action to complete the transaction. It also refused to authorize release of the escrowed funds.

---

[3] The PSA does not contain a § 6.3, but, as the district court did, we assume that this was simply a scrivener's error and that Atlas intended to refer to § 6.2—the section that contains the acreage requirement.

On July 11, 2013, Atlas filed a one-count complaint in the United States District Court for the Northern District of Ohio, claiming that Krizman breached the PSA by refusing to authorize the release of the escrowed funds to Atlas. Krizman filed a three-count counterclaim, seeking a declaratory judgment that it is entitled the escrowed funds and raising two breach-of-contract claims—one to recover the amount in escrow and the other seeking damages equal to the total value of the contract. Additionally, Beau Croxton filed a motion to intervene. Croxton was one of the individuals with whom Krizman was negotiating on April 2–3 as it tried to finalize Atlas's requests relating to the Ervin lease. Croxton sought to intervene as a matter of right pursuant to Federal Rule of Civil Procedure 24(a)(2), claiming that he had an interest in any proceeds realized by Krizman and that no other party was willing to protect that interest. Both Atlas and Krizman objected to his as-of-right intervention and asked the district court also to deny any attempt at permissive intervention.

On cross-motions for summary judgment, the district court found that Krizman was entitled to the escrowed funds because Atlas anticipatorily breached the PSA when it unilaterally terminated the agreement at 5:52 p.m. on April 3, 2013. By subsequent order, however, the district court dismissed Krizman's breach-of-contract claim that sought the total value of the contract, reasoning that the escrow account acted as a liquidated-damages clause that limited Krizman's recovery. The district also denied Croxton's motion to intervene.

Atlas, Krizman, and Croxton appeal. Atlas appeals the district court's determination that Krizman is entitled to the funds in the escrow account. Krizman appeals the district court's finding that the escrow account acted as a liquidated-damages clause. Croxton appeals the district court's denial of his motion to intervene.

5

II.

This court reviews the district court's grant of summary judgment *de novo*. *Domingo v. Kowalski*, 810 F.3d 403, 410 (6th Cir. 2016) (citing *Green Party of Tenn. v. Hargett*, 767 F.3d 533, 542 (6th Cir. 2014)). Construing the evidence in the light most favorable to the nonmovant, *id.* (citing *Villegas v. Metro. Gov't of Nashville*, 709 F.3d 563, 568 (6th Cir. 2013)), summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," Fed. R. Civ. P. 56(a). In Ohio, interpretation of written contracts is a matter of law reviewed *de novo*. *Arnott v. Arnott*, 972 N.E.2d 586, 590 (Ohio 2012) (citing *Saunders v. Mortensen*, 801 N.E.2d 452, 454 (Ohio 2004) ("The construction of a written contract is a matter of law that we review de novo.")). As for Croxton's motion to intervene, "[a] district court's denial of intervention as of right is reviewed de novo, except for the timeliness element, which is reviewed for an abuse of discretion." *United States v. Tennessee*, 260 F.3d 587, 592 (6th Cir. 2001) (citing *Grutter v. Bollinger*, 188 F.3d 394, 398 (6th Cir. 1999)).

III.

A.

To determine which party is entitled to the escrowed funds, we must answer several questions. First, when was the deal scheduled to close? Second, did Krizman have until closing or until only the end of the review period to perform? Third, what was the effect of Atlas's 5:52 p.m. email? Finally, did one or both parties breach the agreement?

1.

The initial PSA contained two deadlines—one for the review period and one for closing. The deadline for the review period and for closing was December 15, 2012. However, unlike the

review period—which had a time-specific deadline of 5:01 p.m. on December 15—there was no specific time of day by which closing had to be completed. Although subsequent amendments to the PSA changed the date for the review period and closing, neither amendment altered the time of day by which they were to be completed. On appeal, the parties dispute the time for closing, and, as a necessary corollary, Krizman's deadline to perform. Atlas asserts that the deadlines for the review period, closing, and Krizman's performance were all the same: 5:01 p.m. on April 3. Krizman claims that, while the review period ended at 5:01 p.m., closing, and Krizman's performance, did not have to occur until 11:59 p.m. that evening.

Under the express terms of the contract, as interpreted by Ohio law,[4] closing did not have to be completed until 11:59 p.m. on April 3. Under Ohio law, "a contract which, by its terms, expires on a certain day, remains in force the whole of that day unless by its express wording it is limited to a certain time of day upon which it expires." *Greulich v. Monnin*, 50 N.E.2d 310, 312 (Ohio 1943) (citation omitted). This gap-filling rule applies here because the PSA did not set a specific time of day for closing, as it did for the review period. Thus, the parties should have had until 11:59 p.m. on April 3 to perform. This is what the district court found, and that finding makes sense—especially if one considers the issues that could arise if, as Atlas would have it, the review period and closing ended simultaneously. Under this view, Atlas could have identified title defects at 4:59 p.m., giving Krizman effectively no opportunity to cure those issues. It seems unlikely that the parties would have intended such a result. And although the PSA here is limited to its own language, our interpretation is consistent with other oil-and-gas-lease-contract cases in this circuit, where the parties have had a review period that ended well before the time of closing. *See Broad St. Energy Co. v. Endeavor Ohio, LLC*, 975 F. Supp. 2d 878, 880 (S.D. Ohio 2013) (requiring any title defects to be reported to seller not later than 30 days prior to

---

[4] The PSA contains an Ohio choice-of-law provision, and the parties do not dispute its applicability.

close), *aff'd*, 806 F.3d 402 (6th Cir. 2015). Accordingly, the district court was right to find that closing was at 11:59 p.m.

2.

Having found that closing and the review period ended at different times on April 3, we must next determine by which of those deadlines Krizman had to cure the title defects that Atlas had previously identified. Section 4 of the PSA governed title-defect issues. Under that section, Krizman agreed to give Atlas access to relevant documents and personnel so that Atlas could complete its title review. Any defects that Atlas found were governed by § 4.3's defect-adjustment procedures. Unlike other oil-and-gas-lease cases, where the underlying contract required the buyer and the seller to agree to any title-defect adjustments, *see Broad St. Energy*, 975 F. Supp. 2d at 880 n.2, the PSA here gave Atlas "sole and absolute discretion . . . to exclude all or any portion of a Lease for title related matters which will then have a corresponding impact on the Purchase Price." (PSA § 4.3(a), Page ID 19.) Section 4 further provided the methodology by which purchase-price adjustments were to be made. And, although § 4.3 gave Atlas sole discretion to exclude acreage, it required Atlas to do so "[o]n or before the end of the Review Period." (*Id.*)

On January 28, 2013, Atlas informed Krizman that it had completed its review and listed the properties requiring remedial action. After this, on February 12, 2013, the parties agreed to extend the review period and the date of closing.[5] On April 2, 2013, Atlas emailed Krizman to inform it of the final six steps that it would need to take to deliver the requisite acreage. There is no dispute that Krizman accomplished four of the six steps and was in a position to deliver title to approximately 1,738 of the 1,856 acres necessary to close the deal. In the early evening on

---

[5] This mutual extension of the review period forecloses any argument that Atlas waived its review-period rights.

April 3, Krizman was attempting to correct the remaining issues with the final parcel—the Ralph Ervin lease—that it needed in order deliver the requisite acreage.

Under the express terms of the PSA, Atlas could have unilaterally excluded any lease—including the Ervin lease—prior to 5:01 p.m. on April 3, the end of the review period. But, once that deadline passed, Krizman had until closing—11:59 p.m.—to complete the tasks listed in the April 2 email. Accordingly, while Atlas could have excluded the Ervin lease before 5:01 p.m. on April 3 or waited until after 11:59 p.m. to see if Krizman had performed—and, under either event, potentially retained the escrowed funds—it did neither. Atlas's 5:52 p.m. email, if construed as an attempt to exclude the Ervin lease, came fifty-one minutes too late, and, if construed as an attempt to terminate the contract, came approximately six hours too early.

3.

We conclude that Atlas's 5:52 p.m. email uncontrovertibly repudiated the PSA. To demonstrate that Atlas anticipatorily repudiated the PSA, Krizman must prove that Atlas "had a duty to do something in the future (by continuing toward closing) but wrongfully refused to do it (by terminating the contract)." *Broad St. Energy*, 806 F.3d at 406 (citing *Se. Land Dev., Ltd. v. Primrose Mgmt., LLC*, 952 N.E.2d 563, 569 (Ohio Ct. App. 2011)). Krizman must establish (1) that Atlas had no right to terminate the PSA, and (2) that Krizman had not already materially breached the PSA. *Id.* (citing *Jackson v. State Farm Fire & Cas. Co.*, 461 F. App'x 422, 426 (6th Cir. 2012)).

There is no doubt that Atlas's 5:52 p.m. email on April 3 refused future performance and repudiated the PSA. It stated:

> The purpose of this letter is for Buyer to inform Seller that, Seller has failed to satisfy Section 6.3 of the Agreement, as amended, by close of business on April 3, 2013, as it has not cleared title to more than 76.85% of the cumulative acreage

totals set forth on Exhibit A to the Agreement. Based upon the foregoing, Buyer
is exercising its right to terminate the Agreement pursuant to Section 8.1.

(DE 1-5, April 3, 2013 Termination Letter, Page ID 68.) Thus, this email informed Krizman that

Atlas was unilaterally terminating the contract and refusing future performance. Atlas's

intention to commit breach was unequivocal and was not a mere statement of doubt. *See Metz v.*

*Am. Elec. Power Co., Inc.*, 877 N.E.2d 316, 323 (Ohio Ct. App. 2007); *see also* Restatement

(Second) of Contracts § 250 cmt. b (1981). Under the PSA, Atlas could not unilaterally

terminate the agreement unless Krizman was in breach or otherwise had not completed its

obligations by closing. And, as demonstrated above, Krizman had not breached the PSA and had

until 11:59 p.m. on April 3 to cure the remaining title defects. At the time Atlas sent the April 3

email, sellers were still in position to potentially deliver title on or before closing, and thus, were

not in breach of the PSA. Accordingly, Atlas's 5:52 p.m. email repudiated the PSA. That,

however, does not end the analysis because Atlas's repudiation does not necessarily entitle

Krizman to the escrowed funds.

4.

Because Atlas anticipatorily repudiated the PSA, Krizman had the option of

"(1) terminating the contract and suing the breaching party immediately, or (2) continuing the

contract and suing the breaching party for damages after the time for performance has passed."

*Haman Enters., Inc. v. Sharper Impressions Painting Co.*, 50 N.E.3d 924, 931 (Ohio Ct. App.

2015) (citing *Sunesis Trucking Co., Inc. v. Thistledown Racetrack, LLC*, 22 N.E.3d 190, 196

(Ohio Ct. App. 2014)). But Krizman did not terminate the PSA and sue immediately nor did it

continue with the contract. In fact, after Atlas's 5:52 p.m. e-mail, Krizman took no further action

to finalize the deal and did not tender performance. Krizman did, however, send Atlas an e-mail

stating its position that Atlas had anticipatorily repudiated the contract and demanding that Atlas

rescind its termination. That e-mail also informed Atlas that Krizman was suspending performance until it received reasonable assurance that Atlas would continue with the deal. Atlas did not rescind its termination or provide any assurance that it would tender performance. And no one disputes that neither party ultimately tendered performance. Thus, as "[i]n many disputes over failure of performance, both parties fail[ed] to finish performance, and the question is whether one of them is justified in so doing by the other party's failure." Restatement (Second) of Contracts § 237 cmt. b.

Krizman claims that it ceased performance due to Atlas's repudiation of the contract and that its non-performance may be excused because neither Ohio law nor the Restatement (Second) of Contracts requires a party to perform where that performance will be futile. *Daniel E. Terreri & Sons, Inc. v. Mahoning Cty. Bd. of Comm'rs.*, 786 N.E.2d 921, 929 (Ohio Ct. App. 2003) ("When one party to a contract repudiates the contract, or gives notice to the other party before the latter is in default that he or she will not perform, the nonrepudiating party is entitled to enforce the contract without previously performing or offering to perform the provisions of the contract in favor of the repudiating party."); *see also Livi Steel, Inc. v. Bank One, Youngstown, N.A.*, 584 N.E.2d 1267, 1270 (Ohio Ct. App. 1989) ("A repudiation of a contract before the time for performance gives the adverse party the option to treat the entire contract as broken and to sue for breach of contract, and there is no necessity in such case for a tender of performance or compliance with conditions precedent, or to wait for the time for performance to arrive."); Restatement (Second) of Contracts § 255 (1981) ("Where a party's repudiation contributes materially to the non-occurrence of a condition of one of his duties, the non-occurrence is excused."). "No one should be required to do a useless act, and if, because of a party's repudiation, it appears that the occurrence of a condition of a duty would not be followed by

11

performance of the duty, the non-occurrence of the condition is generally excused." Restatement (Second) of Contracts § 255 cmt. a. Here, this means that Krizman's failure to produce the requisite acreage may be excused because continuing performance would have been a futile act. Such a rule makes sense: Krizman had no reason to put more money, time, and effort into this deal after Atlas so clearly indicated it would not pay.

But Atlas has a rebuttal. Notwithstanding the other party's repudiation, "[a] party's duty to pay damages for total breach by repudiation is discharged if it appears after the breach that there would have been a total failure by the injured party to perform his return promise." Restatement (Second) of Contracts § 254(1). A failure is total "if it would have been sufficient to have discharged any remaining duties of the party in breach to render his performance." *Id.* cmt. a. In this case, that means if Krizman would have been unable to reach the requisite acreage total by 11:59 p.m. on April 3, Atlas's duty to pay damages for its breach by repudiation would be discharged because Atlas's duty to buy the oil-and-gas leases was contingent on Krizman meeting the acreage total. Thus, if Atlas can show that Krizman could not have performed in any event, the parties will be in mutual breach of the contract and the PSA must be equitably rescinded.[6] *See Admiral Plastics Corp. v. Trueblood, Inc.*, 436 F.2d 1335, 1339 (6th Cir. 1971); *see also Lewis v. White*, 16 Ohio St. 444, 454 (Ohio 1866); *Dickson v. Wolin*, 18 Ohio Law Abs. 107, 109 (Ohio Ct. App. 1934) ("Failure of both parties to perform their contract gives rise to the presumption of mutual assent to a rescission of the contract."); *Areawide Home Buyers, Inc. v. Manser*, No. 04 MA 154, 2005 WL 678512, at *5 (Ohio Ct. app. Mar. 16, 2005) ("[Ohio] courts have held that the mutual failure to perform can give rise to a presumption of mutual assent to rescission.").

---

[6] We need not opine on what effect a finding of mutual breach and rescission of the PSA would have on the parties. This issue has not been briefed and is best left in the first instance to the sound discretion of the district court.

Resolving these issues is a factual matter, *see Hutton v. Monogram Plus, Inc.*, 604 N.E.2d 200, 203–04 (Ohio Ct. App. 1992) (noting that the test for satisfaction of certain terms is "whether the performance would satisfy a reasonable person"—a test that is quintessentially factual); *see also Anderson v. U.S. Cable, Inc.*, No. 94CA2054, 1995 WL 638567, at *3 (Ohio Ct. App. Nov. 1, 1995) (holding that sufficiency of performance under a contract is a question of fact), and there remains a genuine issue of material fact that must be resolved by a factfinder. Here, if the evidence supports that Krizman was capable of completing its performance but, justifiably, stopped performing because of Atlas's repudiation, then Krizman is entitled to the escrowed funds.[7] However, there is at least some evidence in the record—specifically Rob Rauh's April 3 email noting that the transaction might have failed by the end of the night because the logistics were "too difficult"—that suggests that Krizman could not have completed this transaction even if it had continued its attempts to do so. (DE 61-1, April 3, 2013 Rauh Email, Page ID 2877.) Accordingly, the district court's grant of summary judgment for Krizman on the issue of breach, and its award of the escrowed funds to Krizman pursuant to that breach, must be reversed and this issue remanded to the district court.

B.

Section 1.2 of the agreement required Atlas to "deposit as an earnest money deposit an amount in cash equal to one thousand dollars per net acre conveyed to [Atlas], which amount is anticipated to be the sum of $2,411,290.00 . . . ." (PSA § 1.2, Page ID 13.) That section went on

---

[7] Section 1.3 of the PSA states that Atlas retained the escrowed funds only if it:

> fails to close the transaction . . . for one of the following reasons; that (a) Seller does not have defensible title to . . . at least [76.85% of the cumulative acreage total], (b) there has been unanticipated plugging of wells . . . (c) environmental issues . . . (d) there is pending or threatened litigation that relates to the Leases or the transactions . . . (e) Seller cannot transfer to Buyer the right to operate any Utica/Pt. Pleasant wells that would be drilled by Buyer in the future . . . .

(PSA § 1.3, Page ID 13.) Section 1.3's conditions mirror those found in § 6.2, which specified what Krizman needed to do to trigger Atlas's obligations to perform. Section 1.2 also provided that the escrowed funds would be paid to Krizman should the deal fail to close for any reason other than those set forth in § 6.2.

13

to describe how the escrow amount would be released—essentially providing that the escrowed funds would release to the non-breaching party. Additionally, § 7.5 of the PSA provided:

> Notwithstanding any other provision of this agreement, each party hereby expressly disclaims, waives and releases the other party from its own *special, exemplary, punitive, consequential, incidental, and indirect damages* (including loss of, damage to or delay in profit, revenue or production) relating to, associated with, or arising out of this agreement and the transactions contemplated hereby. No law, theory, or public policy shall be given effect which would undermine, diminish, or reduce the effectiveness of the foregoing waiver, it being the express intent, understanding, and agreement of the parties that such damage waiver is to be given the fullest effect, notwithstanding the negligence (whether sole, joint or concurrent), gross negligence, willful misconduct, strict liability or other legal fault of any party.

(PSA § 7.5, Page ID 24–25 (emphasis added).)

Reading these two sections in conjunction, the district court found that Krizman's recovery was limited because § 1.2's escrow account was intended to be a liquidated-damages clause. Because Krizman could not recover more than the escrowed funds, the district court dismissed its claim in Count III for actual damages caused by Atlas's breach.

On appeal, Krizman argues that the district court erred in dismissing its claim for actual damages because § 1.2 was an earnest-money provision that did not expressly claim to be a liquidated-damages clause, or, at the very least, did not state that it was in lieu of actual damages. Earnest-money provisions, Krizman argues, are different from liquidated-damages clauses and are routine in real-estate option contracts because they provide consideration for sellers holding property off the market during the option period. And, contrary to Atlas's position that § 7.5 should be read broadly to bar Krizman's claim for actual damages, Krizman claims that the absence of "actual, direct, compensatory damages" from § 7.5's list of waived damages further supports the notion that it should be permitted to proceed to trial for actual damages.

Ohio case law does not directly answer this question. In some cases, Ohio courts have permitted the non-breaching party to recover actual damages despite the presence of an earnest-money provision, but, in each of those cases, the underlying contract explicitly provided that the earnest-money provision did not limit recovery of actual, direct, or compensatory damages, resolving any ambiguity regarding whether the earnest-money provision was intended to be a liquidated-damages clause. *See Windsor v. Riback*, Nos. 2007–G–2775, 2007–G–2781, 2008 WL 1849617, at *7 (Ohio Ct. App. April 25, 2008) (permitting the non-breaching party to sue for actual damages, where the earnest-money provision was three percent of the purchase price and the contract provided that nothing in it was to limit the non-breaching party's ability to recover actual damages); *see also Gaskins v. Young*, No. 20148, 2004 WL 1178278, at *4–6 (Ohio Ct. App. May 28, 2004) (refusing to limit recovery to the earnest-money provision where the contract did not provide that it was to be liquidated damages or otherwise in lieu of actual damages and where the contract contained a provision noting that the earnest money "shall not prejudice the rights of the . . . non-defaulting party in an action for damages"). In other cases, earnest-money provisions have limited recovery, but there the contracts clearly indicated that the earnest money was to act as liquidated damages, was in lieu of actual damages, or was the non-breaching party's sole remedy. *See Ohio Title Corp. v. Pingue*, No. 10AP–1010, 2012 WL 1077193, at *3–4 (Ohio Ct. App. March 29, 2012) (distinguishing *Windsor* and *Gaskins* because the contract at issue provided that the earnest money was to be liquidated damages and would act as full settlement between buyer and seller); *see also Ottenstein v. W. Reserve Acad.*, 374 N.E.2d 427, 428–29 (Ohio Ct. App. 1977).

The PSA does not fit neatly into either line of cases as it is ambiguous as to the non-breaching party's ability to recover beyond the earnest money. Section 1.2 does not expressly

claim that the escrowed amount is to be paid as liquidated damages or in lieu of actual damages. Nor does it indicate that recovering the escrowed amount is the non-breaching party's sole remedy. But, unlike the Ohio cases that permitted recovery beyond the earnest money paid, the PSA lacks affirmative language that the non-breaching party can recover beyond the funds in escrow.

The district court sought to harmonize the PSA by reading § 1.2 and § 7.5 together. Doing so, it found that the breadth of the waiver in § 7.5, although not explicitly covering actual damages, was sufficient to infer that § 1.2's earnest-money provision was intended to be a liquidated-damages clause. Specifically, the district court noted that § 7.5 stated that the waiver provision was "to be given its fullest effect, notwithstanding the . . . legal fault of any party." (DE 96, Order Dismissing Krizman Count III, Page ID 3825.) Although helpful and reasonable, this interpretation does not fully resolve the issue.

Section 7.5 includes a list of the following damages: special, exemplary, punitive, consequential, incidental, and indirect. According to Black's Law Dictionary, as well as Ohio case law, none of those types of damages includes actual, direct, or compensatory damages. *See Damages*, Black's Law Dictionary (10th ed. 2014) (noting that consequential damages are those that, unlike actual or compensatory damages, do not flow directly from the injurious act); *see also Airlink Commc'ns, Inc. v. Owl Wireless, LLC*, No. 3:10 CV 2296, 2011 WL 4376123, at *3 (N.D. Ohio Sept. 20, 2011) (describing the difference between actual and compensatory damages and special, consequential, incidental, and exemplary damages). Krizman, noting the absence of actual damages or proxy terms, asserts that the maxim of *expressio unius est exclusio alterius*—that which is not included must be excluded—requires that the PSA be interpreted so

as to not bar their recovery of actual damages. Yet, as the district court noted, § 7.5's final

sentence is very broad:

> No law, theory, or public policy shall be given effect which would undermine, diminish, or reduce the effectiveness of the foregoing waiver, it being the express intent, understanding, and agreement of the parties that such damage waiver is to be given the fullest effect, notwithstanding the negligence (whether sole, joint or concurrent), gross negligence, willful misconduct, strict liability or other legal fault of any party.

(PSA § 7.5, Page ID 24–25.) On the face of the contract alone, it is a close question whether this

provision is broad enough to limit Krizman's recovery of actual damages. When combined with

the size of the earnest-money provision in the PSA, however, the issue ceases to be a murky one.

The combination of the two factors leads us to conclude that the earnest-money provision here

should be construed as a liquidated-damages clause.

Usually, earnest-money provisions are a relatively small percentage of the overall

purchase price of the relevant asset. *See Pingue*, 2012 WL 1077193 at *3. Ohio courts have

held that an earnest-money provision that was 7.25 percent of the purchase price was "pushing

the envelope" of enforceability. *Cochran v. Schwartz*, 696 N.E.2d 656, 658 (Ohio Ct. App.

1997). Thus, if not construed as a liquidated-damages clause, the 20-percent-of-the-purchase-

price earnest-money provision here likely would be unenforceable. But, if interpreted as a

liquidated-damages provision, the amount is reasonable and enforceable.

In Ohio, liquidated damages are enforceable so long as:

> the damages would be (1) uncertain as to amount and difficult of proof, and if (2) the contract as a whole is not so manifestly unconscionable, unreasonable, and disproportionate in amount as to justify the conclusion that it does not express the true intention of the parties, and if (3) the contract is consistent with the conclusion that it was the intention of the parties that damages in the amount stated should follow breach thereof.

*Samson Sales, Inc. v. Honeywell, Inc.*, 465 N.E.2d 392, 394 (Ohio 1984) (quoting *Jones v. Stevens*, 146 N.E. 894, 895 (Ohio 1925)). Twenty percent is not unreasonably large relative to the value of the contract. Further, having a liquidated-damages clause in a contract for oil-and-gas leases—assets that are subject to fluctuations concomitant with the always volatile commodities market—is reasonable given the uncertainty that could surround the future value of those assets. Reading the contract as a whole, while considering the large percentage of the purchase price encompassed by § 1.2's earnest-money provision and the breadth of § 7.5's waiver, we find that the parties intended the earnest-money provision to serve as a liquidated-damages clause and thus affirm the district court's decision to limit recovery to the escrowed funds.

## C.

On February 18, 2015 Beau Croxton filed a motion to intervene in this matter, which both Atlas and Krizman opposed. The district court denied Croxton's motion, finding that he could not intervene as-of-right and declining to grant permissive intervention as well.

Federal Rule of Civil Procedure 24(a)(2) governs motions to intervene as-of-right. That rule provides:

> On timely motion, the court must permit anyone to intervene who . . . claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest.

Fed. R. Civ. P. 24(a)(2). Thus, intervention as-of-right will be granted only where the intervenor can show: "(1) timeliness of the application to intervene, (2) . . . substantial legal interest in the case, (3) impairment of the applicant's ability to protect that interest in the absence of intervention, and (4) inadequate representation of that interest by parties already before the

18

court." *Tennessee*, 260 F.3d at 591–92 (citing *Mich. State AFL-CIO v. Miller*, 103 F.3d 1240, 1245 (6th Cir. 1997)). The district court denied Croxton's motion because it found that his motion was untimely and that he lacked a substantial legal interest. It did not reach the remaining two criteria.

This circuit has delineated five factors for determining whether a motion to intervene was timely filed. Those factors are:

> (1) the point to which the suit has progressed; (2) the purpose for which intervention is sought; (3) the length of time preceding the application during which the proposed intervenor knew or reasonably should have known of his interest in the case; (4) the prejudice to the original parties due to the proposed intervenor's failure, after he or she knew or reasonably should have known of his interest in the case, to apply promptly for intervention; and (5) the existence of unusual circumstances militating against or in favor of intervention."

*Id*. (quoting *Grubbs v. Norris*, 870 F.2d 343, 345 (6th Cir. 1989)). "The determination of whether a motion to intervene is timely should be evaluated in the context of all relevant circumstances," *Jansen v. City of Cincinnati*, 904 F.2d 336, 340 (6th Cir. 1990), and the district court's timeliness determination will be affirmed absent an abuse of discretion, *Tennessee*, 260 F.3d at 592. A district court abuses its discretion only when the reviewing court is "left with the 'definite and firm conviction that the court . . . committed a clear error of judgment in the conclusion it reached upon a weighing of the relevant factors' or where it 'improperly applies the law or uses an erroneous legal standard.'" *Id*. (quoting *Huey v. Stine*, 230 F.3d 226, 228 (6th Cir. 2000)).

The district court considered the five timeliness factors noted above and found that Croxton's motion was untimely. It noted that Croxton did not file his motion to intervene until February 18, 2015. This was after the district court had ruled on the cross-motions for summary judgment, and well after the case had originally been filed in July 2013. The extensive progress

19

of the litigation before Croxton attempted to intervene weighs against permitting intervention here. *See Stupak-Thrall v. Glickman*, 226 F.3d 467, 475 (6th Cir. 2000). Further, not only had Croxton known about the suit since its inception, but he had twice been invited to participate and had taken part in discovery. He also had decided not to intervene in July 2014 despite being represented by counsel. The district court concluded that Croxton's late intervention would prejudice the parties, which were heading towards settlement negotiations and mediation on the remaining issues in the case. On this record, we find that the district court did not abuse its discretion in finding Croxton's intervention motion untimely.

The district court further found that Croxton lacked a substantial legal interest in the litigation. It was correct to do so. We "subscribe to a rather expansive notion of the interest sufficient to invoke intervention of right," *Grutter*, 188 F.3d at 398 (citation and internal quotation marks omitted), but the requirement is not without meaning, *Coal. to Defend Affirmative Action v. Granholm*, 501 F.3d 775, 780 (6th Cir. 2007). Although the intervenor "need not have the same standing necessary to initiate a lawsuit in order to intervene in an existing district court suit where the plaintiff has standing," *Providence Baptist Church v. Hillandale Comm., Ltd.*, 425 F.3d 309, 315 (6th Cir. 2005), he "must have a direct and substantial interest in the litigation," *Grubbs*, 870 F.2d at 346. And courts "have generally concluded that a party may not intervene in support of a defendant solely to protect judgment funds that the party wishes to recover itself." *Reliastar Life Ins. Co. v. MKP Invs.*, 565 F. App'x 369, 372 (6th Cir. 2014) (quoting *Deutsche Bank Nat'l Tr. Co. v. FDIC*, 717 F.3d 189, 195 (D.C. Cir. 2013)).

Croxton does not have a substantial legal interest in this litigation. We have declined to adopt a reading of Rule 24 broad enough to permit Croxton to intervene here. *See id.* Croxton

was not a party to the PSA, and any agreements he may have been negotiating with Krizman and others were wholly separate from the contract between Atlas and Krizman. At best, he is one "who 'might anticipate a benefit from a judgment in favor of one of the parties to a lawsuit.'" *Id.* (quoting *Flying J, Inc. v. Van Hollen*, 578 F.3d 569, 571 (7th Cir. 2009)). As the district court found, Croxton's "peripheral interest in this litigation by virtue of the fact that he *may* have an interest in a portion of the *judgment proceeds*" is insufficient to create a substantial legal interest in this case. (DE 81, Op. & Order Mot. to Interv., Page ID 3348.) Having found Croxton's application untimely, as well as lacking a substantial legal interest, the district court did not need to consider the two remaining criteria and properly denied his intervention as-of-right.

Although his motion to intervene did not directly raise it, the district court also refused to allow Croxton permissive intervention. Denial of permissive intervention is reversed only for the district court's clear abuse of its discretion. *Purnell v. City of Akron*, 925 F.2d 941, 951 (6th Cir. 1991) (citing *Meyer Goldberg, Inc. v. Fisher Foods, Inc.*, 823 F.2d 159, 161 (6th Cir. 1987)). As with intervention as of right, the permissive intervenor must bring his application in a timely fashion, Fed. R. Civ. P. 24(b), something that the district found Croxton had failed to do. Nor has Croxton demonstrated that he "has a claim or defense that shares with the main action a common question of law or fact," *id.*, and the district court found that permitting intervention here would cause undue delay and prejudice to the original parties. Thus, the district court did not abuse its discretion in denying Croxton permissive intervention.

## IV.

For the reasons stated above, we affirm the district court's finding that the earnest-money provision should be construed as a liquidated-damages clause and its denial of Croxton's motion to intervene. The district court's grant of summary judgment for Krizman on the issue of breach

and its award of the escrowed funds is reversed and remanded for consideration consistent with this opinion.